Andrew ZIMMERMANN and Kelly Zimmermann, on behalf of themselves and all others similarly situated, Plaintiffs

v.

CAMBRIDGE CREDIT COUNSELING CORP., Cambridge Brighton Budget Planning Corp., Brighton Credit Management Corp., Debt Relief Clearinghouse, Ltd., Cambridge Credit Corp., Cypress Advertising and Promotions, Inc., Brighton Credit Corp., Brighton Debt Management Services, Ltd., Brighton Credit Corp. of Massachusetts, Southfork Asset Management Corp., First Consumers Credit Management Corp., John Puccio, and Richard Puccio, Defendants.

C.A. No. 03–30261–MAP.

United States District Court, D. Massachusetts.

Jan. 7, 2008.

Daniel F. Schreck, G. Oliver Koppell, John F. Duane, Law Offices of G. Oliver Koppell, Joseph S. Tusa, Whalen & Tusa, P.C., New York, NY, David J. Vendler, Morris, Polich & Purdy, LLP, Los Angeles, CA, Garrett M. Smith, Michie Hamlett, Lowry Rasmussen & Tweel, PLLC, Gregory S. Duncan, Charlottesville, VA, Stephen G. Hennessy, Milton, MA, for Plaintiffs.

Brian J. Davis, Law Office of Brian J. Davis, Islandia, NY, Andrew B. Schultz, Great Neck, NY, John E. Garber, Paul S. Weinberg, Weinberg & Garber, P.C., Northampton, MA, Tani E. Sapirstein, Sapirstein & Sapirstein, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO WITHDRAW ADMISSIONS (Dkt. Nos. 187, 198, 200, & 232)*

PONSOR, District Judge.

## I. INTRODUCTION

In November 2003, Plaintiffs Andrew

and Kelly Zimmerman[1] ("the Zimmermans") brought this class action suit against Defendants John and Richard Puccio (collectively the "Individual Defendants") and Cambridge Credit Counseling Corp., Cambridge/Brighton Budget Planning Corp., Brighton Credit Management Corp., Debt Relief Clearinghouse, Ltd., Cambridge Credit Corp., Cypress Advertising and Promotions, Inc., Brighton Credit Corp., Brighton Debt Management Services, Ltd., Brighton Credit Corp. of Massachusetts, Southfork Asset Management Corp., and First Consumers Credit Management Corp. (collectively the "Corporate Defendants") in connection with services they had sought from Cambridge Credit Counseling Corp. The Zimmermans charged Defendants with violating the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679 *et seq.*, and the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*; unjustly enriching themselves at the expense of Plaintiffs; and acting in contravention of the Virginia Consumer Protection Act, Va.Code Ann. § 59.1–196 *et seq.* (Dkt. No. 1, Compl.¶¶ 141–182.)

This court initially allowed a motion to dismiss the Zimmermans' federal claims in June 2004. *Zimmerman v. Cambridge Credit Counseling Corp.,* 322 F.Supp.2d 95 (D.Mass.2004). Plaintiffs appealed that ruling only as to the CROA claim. On May 31, 2005, the First Circuit vacated the dismissal, ruling that a statutory exception to CROA liability for "any nonprofit organization which is exempt from taxation under section 501(c)(3)" of the Internal Revenue Code, 15 U.S.C. § 1679a(3)(B)(i), did not apply to the defendant entities merely because they had registered as section 501(c)(3) organizations. *Zimmerman v. Cambridge Credit Counseling Corp.,* 409 F.3d 473 (1st Cir.2005). The First Circuit then remanded the case for proceedings consistent with its ruling that to qualify for the statutory exemption, entities "must actually operate as nonprofit organizations and be exempt from taxation under section 501(c)(3)." *Id.* at 478 (emphasis in original).

The Zimmermans then filed an amended complaint in October 2005, charging Defendants with violations of CROA (Count I) and unfair or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count II).[2] (Dkt. No. 65, Am. Compl.¶¶ 187–233.) Both Plaintiffs and Defendants have moved for summary judgment on these claims. (Dkt.Nos.187, 198, 200.) Additionally, Defendants seek to withdraw admissions resulting from their failure to respond to requests for admissions served by Plaintiffs in 2005. (Dkt. No. 232.) For the reasons stated below, Defendants' motion to withdraw their admissions will be denied, as will their motion for summary judgment, and

---

1. Plaintiffs' filings indicate that their surname is in fact spelled "Zimmermann." However, since previous decisions in this case have inadvertently misspelled their name "Zimmerman," *see Zimmerman v. Cambridge Credit Counseling Corp.,* 409 F.3d 473 (1st Cir.2005); *Zimmerman v. Cambridge Credit Counseling Corp.,* 322 F.Supp.2d 95 (D.Mass.2004), the court will continue to use the incorrect version in order to preserve consistency among the relevant opinions.

2. Plaintiffs included three other claims in their amended complaint of October 21, 2005 (Dkt. No. 65): unjust enrichment; breach of fiduciary duty with the remedy of a constructive trust; and violation of the Virginia Consumer Protection Act, Va.Code Ann. § 59.1–196 *et seq.* As neither party addresses those claims in the memoranda supporting their cross-motions for summary judgment or any other filings besides the complaint, the court will treat them as waived. (*See* Dkt. Nos. 188, 209.)

Plaintiffs' motion for summary judgment will be allowed.

## II. *FACTS*[3]

### A. *The Credit Repair Organizations Act*

The Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679 *et seq.*, was passed in 1996 in response to the growing trend whereby "credit repair" companies used abusive and misleading practices to take advantage of debtors seeking to improve their credit records. *See* 15 U.S.C. § 1679(a); *Fed'l Trade Comm'n v. Gill*, 265 F.3d 944, 947 (9th Cir.2001). The statute was meant "to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services" and "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b).

In support of those purposes, Congress developed a scheme to subject credit repair organizations ("CROs") to certain *ex ante* disclosure requirements in dealing with consumers and to prohibit them from engaging in deceptive practices injurious to the public. *See id.* §§ 1679b–1679e. This case presents the issue of whether any Defendant was acting as a credit repair organization and was therefore subject to the requirements and penalties of CROA. As will be seen, the undisputed facts confirm that all Defendants were either acting as CROs or were intertwined in the Puccios' credit repair business and that the federal statute is fully applicable.

### B. *Factual Background*

#### 1. *The Puccio Companies.*

John and Richard Puccio are brothers who founded Cambridge Credit Counseling Corporation ("CCCC") in 1996 as a Massachusetts corporation. They filed papers to register CCCC as a nonprofit entity under Massachusetts law and as a 26 U.S.C. § 501(c)(3) nonprofit entity under federal law. The IRS form accompanying CCCC's application for § 501(c)(3) status,

---

3. Except where otherwise noted, these facts are drawn from the following documents: Dkt. No. 190, Defs.' Rule 56.1 Statement; Dkt. No. 219, Ex. 1, Pls.' Resp. to Defs.' Local Rule 56.1 Statement; Dkt. No. 210, Pls.' Local Rule 56.1 Statement of Uncontroverted Facts; and Dkt. No. 220, Defs.' Resp. to Pls.' Rule 56.1 Statement. Since the court is faced with cross-motions for summary judgment, all factual disputes are construed in this summary in the light most favorable to the relevant non-moving party.

It must be noted that Defendants failed properly to dispute many of Plaintiffs' proffered facts. Although Defendants lodged objections to a number of statements in Plaintiffs' 56.1 statement, they often did not cite any record evidence to support their disagreement despite the requirement of Local Rule 56.1 that in opposing a motion for summary judgment a party must "include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, *with page references to affidavits, depositions and other documentation.*" (*Compare, e.g.,* Dkt. No. 210, Pls.' Local Rule 56.1 Statement of Uncontroverted Facts ¶ 15 *with* Dkt. No. 220, Defs.' Resp. to Pls.' Rule 56.1 Statement ¶ 15.) In such instances, the court has taken the Plaintiffs' account as true. As the First Circuit recently stated:

> The purpose of [Local Rule 56.1] ... is to require the parties to focus the district court's attention on what is, and what is not, genuinely controverted.... Otherwise, the parties improperly shift the burden of organizing the evidence presented in a given case to the district court.... Given [the rule's] important purpose, this Court has repeatedly upheld its enforcement, stating that litigants ignore it "at their peril."

*Mariani–Colon v. Dep't of Homeland Security*, 511 F.3d 216, 220 (1st Cir.2007) (citations omitted).

signed by defendant John Puccio, stated that the company's clients would enjoy, among other benefits, an "Improved Credit Rating." CCCC's website and its customer service agreements represented that it was a "not-for-profit" organization. Defendant Richard Puccio served as CCCC's vice president and strategic planner and as one of its board members.

CCCC was staffed by personnel from John Puccio's previous New York businesses Brighton Credit Corporation ("BCC") and Cambridge Credit Corporation ("CCC"),[4] which had been ordered to cease operating by the New York Banking Department in October 1996, and it provided the same services as BCC and CCC. CCCC also purchased the New York companies' "intangible assets," described as the goodwill in their trademarks and copyrights, for $14.1 million. Significantly, neither BCC nor CCC had been issued any trademarks or copyrights at the time of the purchase. Moreover, no negotiations regarding the purchase took place and CCCC did not have independent representation. John Puccio signed the sale agreement on behalf of CCCC and both he and Richard Puccio signed it on behalf of CCC and BCC.

John Puccio managed the day-to-day operations of CCCC. While he did so, CCCC paid large sums of money to other companies that he owned, despite their not having rendered any services to CCCC. For example, John and Richard Puccio owned JRJ Associates, Inc., which received $150,000 from CCCC without having done any work for it.

After BCC and CCC ceased operating, John Puccio started Cambridge/Brighton Budget Planning Corporation ("CBBPC") in New York as a so called "credit counseling" agency and served as its president.

CBBPC advertised its not-for-profit status on its website and on its service agreements. Puccio also created Brighton Credit Management Corporation ("BCMC") as a Florida nonprofit entity, and was its sole officer and director. All of these companies used virtually identical service agreements, and CCCC, CBBPC, and BCMC publicized their affiliation with each other.

A major service advertised by the Puccios' credit companies was the development of individualized Debt Management Plans ("DMPs") for clients. After gathering information about a customer's debts, the business would devise a plan setting a single monthly payment to be remitted to it by the client for disbursement to his or her creditors. CCCC's 2001, 2002, and 2003 tax returns described "the principal objectives of the Corporation's Debt Management Program" as including "improv[ing] a consumer's credit rating over time by establishing a consistent payment history ..." Customers were charged an initial up-front "Design Fee" for the development of this DMP.

The credit companies would also negotiate with a client's creditors for better terms on their debt, for example seeking the reduction of interest rates on debt or a decrease in the debt principal. They would additionally attempt to "re-age" the customer's accounts by contacting a creditor to whom a customer owed late payments and convincing the creditor to relabel the account current (thus avoiding late fees and a negative report by the creditor to credit bureaus), in exchange for the customer committing to payments on that account for a set amount of time. (*See* Dkt. No. 224, Ex. 10, Wobig Dep. 155:6–164:18.)

4. John Puccio formed and served as president of both BCC and CCC.

For some period of time, employees of CCCC, BCMC, and CBBPC were compensated based on how many customers they enrolled, receiving commissions from the initial fee paid by the client. At CCCC, low sales volumes were penalized and bonuses were given for high sales.

Brighton Credit Corporation of Massachusetts ("BC Mass"), also known as Brighton Debt Management Services ("Brighton DMS") and First Consumers Credit Management Corp. ("First Consumers"),[5] provided "back-office support" for the other three companies' customers. BC Mass would design DMPs for customers, service their accounts, and keep the requisite records. It would also communicate with creditors in order to achieve "re-aging" of accounts. BC Mass did not have clients of its own.

John Puccio was the president, treasurer, and half-owner of BC Mass. Richard Puccio was BC Mass' vice president and other half-owner. When BC Mass changed its name to Brighton DMS in 2003, John Puccio transitioned to a position as its president and sole shareholder. He remained as president when Brighton DMS became First Consumers.

John Puccio created and controlled CCCC, BCMC, CBBPC, BC Mass, Brighton DMS, and Debt Relief Clearinghouse, Ltd. ("DRC").[6] Until he left the board of CCCC, he also determined the terms of all contracts and business dealings among CCCC, BCC, BCMC, DRC, Brighton DMS, BC Mass, Cypress Advertising and Promotions, Inc. ("Cypress"),[7] Southfork Asset Management Corp. ("Southfork"), and First Consumers.

All of these businesses shared employees and office space, and the managers of one of them would supervise employees of others. John and Richard Puccio would charge expenses for one company to the credit card of another and then pay that credit card bill with a check from a third of their corporations. At least one person who had worked for CCCC, BC Mass, and Brighton DMS at different times directly received bank statements of CCCC and other Puccio-owned companies while not employed by them and would write checks to · pay those bills. CCCC purchased equipment for BC Mass and Brighton DMS, and the Puccios would even use corporate funds for personal items, including on one occasion a yacht charter. John Puccio approved payment of all credit card bills.

The Puccios' companies advertised their ability to improve a client's credit. CCCC's website announced that "by taking advantage of our Debt Management Program, we can help you ... Re-establish Your Credit." (Dkt. No. 204, Ex. 28, at 10–11.) Similarly, the promotional materials of CCCC, BCMC, and CBBPC made

---

5. Despite these name changes, Defendants conceded that "the businesses were essentially the same from Brighton Credit of Mass to Brighton DMS to First Consumers." (Dkt. No. 201, Ex. B, BC Mass/Brighton DMS/First Consumers 30(b)(6) Dep. 63:13–18.) For convenience's sake, the court will generally refer to all incarnations of this entity as BC Mass.

6. John and Richard Puccio owned and controlled DRC. The company acted as a marketing unit, helping CCCC, BCMC, and CBBPC obtain leads on potential customers. It advertised that these companies could improve customers' credit. DRC earned $130 per client lead from CCCC in January 2000. CCCC's board increased that fee to $750 as of January 2002 upon the motion of John Puccio.

7. Cypress placed advertisements for the Puccio credit companies, complementing DRC's marketing services. (See Dkt. No. 201, Ex. E, DRCH/Cypress 30(b)(6) Dep. 67:7–70:12, 173:11–174:1.)

promises such as "we can help you … restore your credit rating" and "[w]hen you join our debt management program, we'll be able to help you reestablish your credit." (*See, e.g.,* Dkt. No. 170, Ex. 1, at 1; Dkt. No. 204, Ex. 28, at 10; Dkt. No. 204, Ex. 18, at 1.) CCCC also gave advice regarding credit through its website's "Cambridge Answer Man" feature, which had the goal of "help[ing] people understand the often confusing world of credit." (Dkt. No. 204, Ex. 20.) This feature answered questions such as "How Can I Rebuild My Credit?" (*Id.;* Dkt. No. 204, Ex. 28, at 12–13.) Additionally, CCCC sent out a quarterly newsletter containing advice on how "to rebuild your credit." (Dkt. No. 191, Ex. 7, at 2.)

Once a consumer had enrolled in a DMP, BC Mass would mail them a "welcome package." The package would include a section entitled "A Fresh Start," stating "[t]hat is exactly what you have received by joining our program." (Dkt. No. 214, Ex. F.) This section listed "an improved credit profile" among "the life benefits you receive by using our program."

Customers of CCCC, BCMC, and CPPBC would speak to BC Mass employees when they called any of those companies. The BC Mass staff were trained to speak about the benefits of re-aging accounts, while CCCC, BCMC, CBBPC, and BC Mass personnel were all coached to answer questions regarding how joining a DMP might affect a customer's credit score. The standardized sales scripts used by these entities directed employees to tell callers that with respect to enrolling in a DMP,

> You're already behind with the bills so this can only help your credit. By making your payments on time to us we will be able to bring your accounts back to a current status, plus establish a credit

reference to back you up when you apply for future financing.

(Dkt. No. 204, Ex. 21, at 3.) Alternatively (depending on how far behind in payments a customer was), the script instructed staff to say, "So long as you follow through with the program it can only help not hurt." (*Id.*)

CCCC staff were trained to follow their script closely and evaluated on how well they adhered to it. The script described monthly fees as covering the company's overhead costs and contained an explanation of the initial fee, paid before the company performed the service of contacting the client's creditors.

If a customer inquired into the possibility of settling his or her accounts (and thus ending the relationship with the company), the script for BCMC, CCCC, and CBBPC prescribed a message that

> settlements can damage your credit almost as much as a bankruptcy … Our program is designed to get you out of debt and protect your credit rating…. Over the course of the program your credit rating will improve, making it easier to qualify for financing in the future.

(Dkt. No. 204, Ex. 22, at 00086.) Further persistence by a customer in asking about debt settlement would trigger the response:

> If you settle your debts, your credit rating will fall a lot further than it is now.

> Our program is designed to help you get out of debt and *improve* your credit rating. You will reestablish a good payment history and improve your debt to income ratio. Over the course of the program your credit rating will improve….

(*Id.* (emphasis in original).)

None of the Puccio companies complied with CROA. They did not provide custom-

ers with the disclosure statement required by § 1679c of the statute or keep copies of such statements on file for two years. Additionally, neither CCCC, BCMC, nor CBBPC gave clients the Notice of Cancellation set out in § 1679e(b). Their customer agreements did not include an estimation of the date by which the provided services would be complete or how long it would take to carry them out, nor did the contracts disclose that fees were being paid to BC Mass. Moreover, these companies charged an up-front fee to their customers for services that had not yet been fully performed, a practice prohibited to credit repair organizations by § 1679b(b).

Between its creation and December 31, 2004, CCCC received $185,736,640 of income from customers. Clients' initial up-front payments accounted for $70,494,408 of that amount, with the rest coming from monthly fees. From November 3, 1998 to December 31, 2004, BCMC earned $63,057,703 from customer payments and CBBPC earned $10,291,640.

From 1997 through 2003, BC Mass grossed $47,365,448 based on its services to CCCC, BCMC, and CBBPC, with a net profit of $10,663,281. Brighton DMS was paid $31,548,091 for its services in 2003 and 2004, with a profit of $9,572,189. DRC earned $44,7000,684 in revenue from 2001 to 2004, primarily from CCCC and CCBPC.

John and Richard Puccio received salaries from their corporations. CCCC paid each of them $624,000 in 2001 and again in 2003. In 2004, John Puccio's salary from CCCC was $648,000. In the period from 1996 to 2004, John Puccio's salary from his credit companies totaled $30,987,572, while Richard Puccio's aggregate compensation was $21,719,908.

### 2. *The Zimmermans.*

Andrew and Kelly Zimmerman, a married couple, learned of CCCC in late 2001 through radio, television, and Internet advertisements in which the company offered to "[assist with] debt consolidation, [help debtors] pay down debt more quickly, [and] reage accounts." (Dkt. No. 201, Ex. A, Andrew Zimmerman Dep. 71:23–72:7.) Andrew Zimmerman, who handled all subsequent communications with CCCC, called the company's toll-free number in December 2001 to find out more about its debt counseling services. He was attracted in part by its advertised nonprofit status.

After speaking with a CCCC representative, the Zimmermans received a five-page service agreement from CCCC. The Service Agreement provided that CCCC would consolidate Plaintiffs' monthly payments into a single payment, use its best efforts to reduce the amount of monthly payments and lower the interest rate on payments, and pay the customer a portion of creditor contributions obtained through CCCC's Good Payer Program.[8] (Dkt. No. 181, Ex. B, ¶¶ 1–4.) Additionally, the contract contained the following disclaimers:

### VIII. *DEBTOR'S CREDIT RATING AND ACCOUNTS*

The CLIENT understands that CAMBRIDGE makes no representation about any aspect of the CLIENT'S credit rating. Creditors will sometimes report participation in CAMBRIDGE's program as a "consumer credit counseling" item on your credit report. Persons with perfect credit histories may have their credit record adversely affected. CAMBRIDGE has no control over

---

**8.** The Good Payer program allowed Plaintiffs to receive a "bonus" for each six months of payments according to their plan, equal to half of the amount of contributions obtained from their creditors by CCCC.

reporting or interpretation, as it is strictly a creditor and lender decision. The CLIENT's credit rating is outside of the scope of this Agreement, however, at the CLIENT's request, CAMBRIDGE will provide CLIENT with credit references based upon CLIENT's payment history with CAMBRIDGE....

## IX. *NO OTHER REPRESENTATIONS*

CAMBRIDGE has not authorized any person or other company to make representations on its behalf concerning fees, credit, any services to be performed by CAMBRIDGE or any other matter. In the event you were referred to CAMBRIDGE by another company, you understand that the other company was not authorized to make any representations about CAMBRIDGE or its services. You agree that all the representations concerning fees, credit, refinancing or any services to be performed by CAMBRIDGE that were made by CAMBRIDGE or relied upon by you when you signed this Service Agreement are set forth in this Agreement.... All the obligations of CAMBRIDGE are set forth in this agreement.

(*Id.*, Parts VIII, IX.)

In return for these services, CCCC charged a "Design Fee" equivalent to one monthly payment, due upon Plaintiffs' acceptance of the DMP designed by CCCC, as well as a monthly payment processing fee of ten percent or twenty-five dollars, whichever was greater.

Approximately seven days after receiving the service agreement, Andrew and Kelly Zimmerman signed the document and returned it to CCCC.[9] Once CCCC received the Zimmermans' financial information, it offered them a proposed DMP with a monthly payment of $798. Plaintiffs enrolled in the DMP and paid their $798 up-front fee.

At this point, the Zimmermans' account was transferred to BC Mass, a for-profit company, although they were not informed of the transfer. BC Mass mailed Plaintiffs a welcome packet, which they did not read. In the course of Plaintiffs' participation in the DMP, BC Mass negotiated a reduction in the interest rate on some of their debts, the elimination of some of their late charges and fees, and a decrease in the minimum payments on some of their accounts. None of these efforts involved the company contacting a credit reporting agency on behalf of the Zimmermans.

After approximately nine months, the Zimmermans terminated their relationship with CCCC. Andrew Zimmerman based this decision on the facts that some of the couple's accounts had not been re-aged, some of their creditors refused to participate in their DMP, and some of their account balances and interest rates were increasing. In 2003, Plaintiffs declared bankruptcy.

### 3. *The Ongoing Litigation.*

Plaintiffs brought suit against CCCC in two parallel cases. They filed their com-

---

9. Defendants contend that the Zimmermans "admitted that ... there were no representations made by CCCC not contained in the Service Agreement." (Dkt. No. 190, Defs.' Rule 56.1 Statement ¶ 19.) This assertion is not, however, supported by the cited portions of Andrew Zimmerman's deposition. (Dkt. No. 219, Ex. A, Andrew Zimmerman Dep. 150–152.) Zimmerman merely stated that he could not recall whether there were any such representations. Furthermore, elsewhere in his deposition Zimmerman mentioned several representations made by CCCC in advertisements that he saw or heard before signing the service agreement. (*See* Dkt. No. 191, Ex. 3, Andrew Zimmerman Dep. 71:25–73:15, 114:7–13, 114:21–115:7, 249:25–250:19.)

plaint in this court on November 3, 2003. (Dkt. No. 1, Compl.) The same year, they sued CCCC and other defendants as part of a separate class action in the Eastern District of New York. *See Limpert v. Cambridge Credit Counseling Corp.,* 328 F.Supp.2d 360 (E.D.N.Y.2004).

*Limpert* culminated in a settlement between CCCC and the plaintiff class, including the Zimmermans, in August 2006. (Dkt. No. 191, Ex. 6, Stipulation and Agreement of Settlement.) As a result of that settlement, CCCC was dismissed from this case by joint motion in February 2007. (*See* Dkt. No. 159.)

One matter at issue in the motions before the court is the fate of certain requests for admissions ("RFAs") served along with requests for production of documents on October 28, 2005, to attorney Paul M. Kaplan, who was at that time representing the Puccios and former Defendant CCCC. (Dkt. No. 204, Exs. 1–1, 1–2, CCCC RFAs.) On the same date Plaintiffs sent similar requests to attorney Brian J. Davis, who represented Defendants CBBPC, BCMC, and BC Mass (with copies to Kaplan as he was then also counsel of record for these three companies). (Dkt. No. 204, Ex. 2, CBBPC, BCMC, BC Mass RFAs.) For almost two years, neither CCCC nor CBBPC, BCMC, and BC Mass responded to the RFAs, though Kaplan did respond to the accompanying document production requests served on his clients John and Richard Puccio and CCCC.

### III. DISCUSSION

#### A. *Withdrawal of Admissions*

Federal Rule of Civil Procedure 36(a) provides that if a party serves a written request for admission as to a particular matter upon another party, that matter is admitted unless the receiving party fur-nishes a written answer or objection within thirty days. Here, Defendants concede that their response to Plaintiffs' October 28, 2005, set of RFAs was untimely (and in fact was not provided until September 12, 2007). (*See* Dkt. No. 226.) Attorney Brian Davis, who currently represents the Corporate Defendants in this case, has submitted a declaration to the court stating that "I received the subject 'Notices to Admit,' but through unintentional inadvertence ... I overlooked the papers and I never presented the papers to my clients for their consideration." (Dkt. No. 232, Decl. of Brian J. Davis, Esq.) Given this history, under the usual operation of Rule 36 the RFAs would be deemed admitted.

Defendants have requested that the court allow them to withdraw those admissions pursuant to Rule 36(b), which states that a court may

> permit withdrawal or amendment [of an admission] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

This withdrawal provision "emphasizes the importance of having the action resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice." Fed.R.Civ.P. 36(b), Advisory Committee's Note.

■ Though the factors of subservience to the merits and prejudice to the opposing party generally dominate a Rule 36(b) inquiry, the rule also provides that withdrawal of admissions is "subject to the provision of Rule 16 governing amendment of a pre-trial order." Fed.R.Civ.P. 36(b). In this case, the extraordinarily long delay in responding to the RFAs makes the con-

siderations of trial management embodied in Rule 16 paramount. Permitting withdrawal of these admissions would necessitate the re-opening of discovery, and thus alteration of the pre-trial order (Dkt.Nos.143, 157), in this already ancient and complex case. *Cf. LaSalle Bank Nat'l Ass'n v. Capco Am. Securitization Corp.,* No. 02–9916, 2006 WL 177169, *1, 2006 U.S. Dist. LEXIS 2600, at *3 (S.D.N.Y. Jan. 25, 2006) (denying a similarly timed Rule 36(b) motion). Therefore, Defendants must satisfy Rule 16's requirement of showing "good cause" for the court to allow withdrawal of their admissions and a return to the discovery stage of this now four-year-old case. Fed.R.Civ.P. 16(b)(4); *see also LaSalle Bank,* 2006 WL 177169, *1, 2006 U.S. Dist. LEXIS 2600, at *3; *Scaffidi v. United Nissan,* No. 04–1366, 2005 U.S. Dist. LEXIS 41640, at *12–*14 (D.Nev. Sept. 30, 2005).

"Rule 16(b)'s 'good cause' standard emphasizes the diligence of the party seeking the amendment.... 'Indifference' by the moving party 'seals off this avenue of relief' irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause." *O'Connell v. Hyatt Hotels,* 357 F.3d 152, 155 (1st Cir.2004) (citations omitted). Here, the extensive delay of Defendants in attending to the RFAs, accompanied by only a minimal explanation of "inadvertence," is insufficient to show the diligence that would surmount the good cause standard. *Cf. Berwind Prop. Group*

*Inc. v. Envtl. Mgmt. Group, Inc.,* 233 F.R.D. 62, 67 (D.Mass.2005) (finding no good cause for fifteen month delay where party could have filed motion to amend within the proper time period).

The good cause requirement nullifies Defendants' argument that a party's excuse, or lack thereof, for failure to respond to requests for admission is irrelevant to a Rule 36(b) inquiry. The case they cite for that proposition, *Federal Deposit Insurance Corp. v. Prusia,* 18 F.3d 637, 640 (8th Cir.1994), involved the amendment of a submitted admission, apparently before a scheduling order was issued or any discovery undertaken. Furthermore, even where Rule 16 does not come into play, courts have been willing to consider a party's lack of diligence as a reason to deny withdrawal of admissions.[10] *See, e.g., Conlon v. United States,* 474 F.3d 616, 625 (9th Cir.2007) ("[I]n deciding whether to exercise its discretion when the moving party has met the two-pronged test of Rule 36(b), the district court may consider other factors, including whether the moving party can show good cause for the delay and whether the moving party appears to have a strong case on the merits."); *In re Carney,* 258 F.3d 415, 419 (5th Cir.2001) ("Even when these two factors [subservience of the merits and prejudice] are established, a district court still has discretion to deny a request for leave to withdraw or amend an admission."); *Carlson v. Freightliner LLC,* 226 F.R.D. 343,

---

**10.** At least some courts have questioned whether the Rule 36(b) test should even apply where a party has failed outright to answer requests for admission, given that the usual standard governing motions to permit an action under the Federal Rules of Civil Procedure after the relevant time period has expired is the more rigorous Rule 6(b)(2) "excusable neglect" standard. *See Sea–Land Serv. v. Citihope Int'l,* 176 F.R.D. 118, 122 n. 10 (S.D.N.Y.1997) (suggesting that the Rule

36(b) test should apply "only in circumstances in which a party has filed a timely response to a Rule 36 request but later seeks to change or withdraw its response"); *Nat'l Coalition v. Wilkey,* No. 00–1686, 2007 WL 951559, *2, 2007 U.S. Dist. LEXIS 21719, at *8 (N.D.N.Y. Mar. 27, 2007). The court does not address this question as the result for Defendants is the same under either standard.

361 (D.Neb.2004) ("The presence of improper conduct by the party moving to withdraw or amend an admission, and that party's lack of reasonable explanation for untimely discovery responses, may be considered by the court in determining whether to grant a motion to withdraw or amend a deemed admission.").

In this case, Defendants' neglect of their obligations under Rule 36 was conspicuous. Though chalking up their initial failure to respond to the RFAs to Attorney Davis' "inadvertence," they do not explain the lack of response by Paul Kaplan, who was then acting as counsel for CCCC and the Puccios as well as co-counsel for CBBPC, BCMC, and BC Mass. Kaplan's lack of response is especially puzzling given that he did respond to the document production requests and interrogatories that were sent under the same cover letter as the RFAs.

The court also cannot ignore the fact that the two attorneys left their lapse uncorrected for seventeen months, exacerbating the initial harm caused by their failure to answer the RFAs.[11] *See Branch Banking & Trust Co. v. Deutz–Allis Corp.*, 120 F.R.D. 655, 659 (E.D.N.C.1988) ("When a party directs its resources, fiscal, physical and otherwise, to those issues it reasonably believes are the only ones left to be resolved, an abrupt change in the status of the litigation occasioned by motion of opposing counsel, which had it occurred early on would likely have effected a distinctly different allocation of resources, should only be allowed upon a showing that the Rule 36(b) test is met by clear and convincing evidence.").

Most egregiously, Defendants still failed to address the issue of the admissions for another five months after Plaintiffs explicitly stated in March 2007 their intent to treat the RFAs as admitted for purposes of their class certification motion, with no explanation for the further delay.[12] (*See* Dkt. No. 170, Decl. of Garrett M. Smith ¶¶ 3–7; Dkt. No. 171, Mem. in Support of Pl.'s Mot. for Class Certification at 8, 28.) As of August 27, 2007, Attorney Davis stated that he "did not forward or discuss the 'Notices to Admit' ... up to the time when plaintiffs referred to the 'notices' a few weeks ago on their summary judgment motion." (Dkt. No 218, Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 10–11.) This added delay in the face of Plaintiffs' reliance on the RFAs provides further reason for the court to deem Defendants bound by their inaction. *Cf. Thornhill v. Perry*, No. 04–0947, 2007 WL 2028594, *3, 2007 U.S. Dist. LEXIS 53125, at *7–*8 (E.D.Cal. July 9, 2007) (refusing permission to withdraw even though litigant was *pro se* where the "requests for admissions [went] unanswered well past the period provided for" and the opposing parties "re-

---

**11.** As Plaintiffs suggest, this blunder may to some extent be traceable to Defendants' repeated replacement of counsel during this litigation. (*See* Dkt. Nos. 43, 109, 114, 148.) However, Defendants cannot escape being held responsible for the actions, or in this case inaction, of their chosen legal representatives. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *O'Connell v. Hyatt Hotels*, 357 F.3d 152, 155 (1st Cir.2004).

**12.** While it is not a substantial factor in this decision, the court does also note that Defendants did not even bother to contradict the admissions with citations to facts on the record when Plaintiffs cited the RFAs in their Statement of Uncontroverted Facts (Dkt. No. 210), despite the requirement of Local Rule 56.1 that they do so in disputing Plaintiffs' version of the facts on summary judgment. Furthermore, Defendants did not provide any response to the admissions at all until *after* oral argument on their motion to withdraw them, and then only at the court's request. (*See* Dkt. No. 226.)

lied upon the admissions through the discovery cut-off dates"); *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 123 F.R.D. 97, 107 (D.Del.1988) (factoring in party's "unreasonable delay in bringing its motion to amend and clarify its admissions" in finding prejudice).[13]

Even ignoring Defendants' extreme negligence and its catastrophic impact on the management of this case, and focusing only on the goals of facilitating the presentation of the merits and avoiding prejudice to the opposing party, the court finds more than sufficient reason to deny Defendants' motion to withdraw their admissions. It is true that allowing the admissions to stand will prevent the Corporate Defendants from contesting the key issues of whether they are "credit repair organizations" and whether they have failed to comply with CROA's requirements for such entities. (*See* Dkt. No. 204, Ex. 2, Tab A, RFAs 1–

6, 11–18.) This impact offers some justification for allowing withdrawal, since the First Circuit has noted that " 'the first half of the test is clearly satisfied [where] the effect of upholding the admissions would be to practically eliminate any presentation of the merits.' " *Siguel v. Allstate Life Ins. Co.*, No. 94–1392, 1995 WL 98240, 1995 U.S.App. LEXIS 4666 (1st Cir. Mar. 10, 1995) (unpublished table case) (*citing Westmoreland v. Triumph Motorcycle Corp.*, 71 F.R.D. 192, 193 (D.Conn.1976)).[14]

Any concern about subverting the presentation of the merits vanishes in this case, however, in the face of strong evidence (current counsel's claims of negligence notwithstanding) that the decision not to respond to the RFAs was deliberate and constituted a tactical decision to focus on other issues, which Defendants now wish to repudiate. *See Coca–Cola Bottling Co. v. Coca–Cola Co.*, 123 F.R.D. 97, 108

---

**13.** The court also cannot entirely ignore the Defendants' lack of compliance with other procedural requirements in this litigation and in the parallel case *Limpert v. Cambridge Credit Counseling Corp.*, No. 03–5986, 2006 U.S. Dist. LEXIS 46939 (E.D.N.Y. July 12, 2006). Judge William D. Wall has criticized Defendants' use of "dilatory tactics" in the *Limpert* case. (*See* Dkt. No. 217, Ex. 1, at 29:1–7.) In this litigation, Defendants' unresponsiveness is evidenced by their failure, previously discussed in footnote 3, to comply with Local Rule 56.1 in responding to Plaintiffs' statement of undisputed facts accompanying their motion for summary judgment. Rule 56.1 provides that in opposing summary judgment, a party must "include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, *with page references to affidavits, depositions and other documentation*" (emphasis added), yet Defendants' statement disputing the material facts set out by Plaintiffs in support of their motion is notably lacking in citations to the record. (*See* Dkt. No. 218, Defs.' Resp. to Pls.' Rule 56.1 Statement.) As the First Circuit has warned,

> Rules such as [Rule 56.1] "were developed by the district courts in this circuit in re-

sponse to this court's concern that, absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised factual issues.' Such rules are a distinct improvement—and parties ignore them at their peril."

*Gosselin v. Webb*, 242 F.3d 412, 415 (1st Cir. 2001) (citations omitted). Most recently, Plaintiffs have complained that Defendants failed to confer with them before filing this motion, in violation of Local Rule 7.1. (Dkt. No. 224, Pls.' and the Certified Classes' Mem. of Law in Opp. to Defs.' Mot. Pursuant to Rule 36(b) at 7–8.)

**14.** Plaintiffs correctly note that *Siguel* is an unpublished opinion and thus cannot be cited as binding precedent under Local Rule 32.3(a). However, the court may consider the opinion for its persuasive value, which in this case has some force since the *Siguel* decision reflects a view held in several circuits. *See, e.g., Conlon v. United States*, 474 F.3d 616, 621 (9th Cir.2007); *Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir.2005); *Perez v. Miami–Dade County*, 297 F.3d 1255, 1265 (11th Cir.2002).

(D.Del.1988) ("A per se rule that a court must permit withdrawal of an admission simply because it relates to an important matter in the litigation is inappropriate in light of the discretionary language of the Rule and its purpose: to narrow the issues, thereby avoiding litigation of unessential and undisputed facts.") (*quoting Branch Banking & Trust Co. v. Deutz–Allis Corp.,* 120 F.R.D. 655, 660 (E.D.N.C. 1988)).

After the First Circuit rejected their argument that they fit within an exception to CROA as registered nonprofit companies, *Zimmerman v. Cambridge Credit Counseling Corp.,* 409 F.3d 473 (1st Cir. 2005), Defendants did move to dismiss based on the theory that they were not subject to CROA because they provided "credit counseling" rather than "credit repair" services. (Dkt. No. 48, Defs.' Mot. to Dismiss for Failure To State a Claim ¶ 9.) However, the court denied Defendants' motion from the bench on September 14, 2005. About a month later, Plaintiffs served the contested RFAs, including one requiring Defendants, in essence, to admit or deny that they are credit repair organizations.

Aside from a *pro forma* denial of Plaintiffs' allegation that the Corporate Defendants are CROs in their answer to Plaintiffs' amended complaint, the record for the time period between the serving of the RFAs and Plaintiffs' filing of their motion for summary judgment contains no indication that Defendants were pressing the argument that they do not qualify as credit repair organizations. (*See* they do not Dkt No. 72, Answer ¶¶ 94–102, 188–89.)[15] This suggests that Defendants' failure to respond to the RFAs signaled deliberate intent to abandon this theory after its unsuc-cessful initial presentation to the court in 2005, but that they seek to revive the argument now that somewhat more favorable case law is available. *See, e.g., Hillis v. Equifax Consumer Servs., Inc.,* 237 F.R.D. 491 (N.D.Ga.2006); *Plattner v. Edge Solutions, Inc.,* 422 F.Supp.2d 969 (N.D.Ill.2006).

Even if Defendants did intend to continue denying their CRO status, their failure to respond to Plaintiffs' RFAs on that point prevented Plaintiffs from shaping their discovery accordingly. (*See* Dkt. No. 224, Ex. 4, Decl. of Garrett M. Smith in Opp. to Rule 36(b) Mot. ¶ 20.) If Defendants' attempt to withdraw their admissions is, as it appears, a change in litigation strategy by Defendants, it would betray the underlying purpose of Rule 36 to allow withdrawal of these admissions when discovery has been conducted and motions have been prepared in reliance on a particular legal theory. *Cf. Banos v. City of Chicago,* 398 F.3d 889, 893 (7th Cir.2005) (upholding district court's denial of motion to withdraw admissions that precluded a legal theory that the petitioning party had initially pursued, but abandoned before discovery began); *Mut. Serv. Ins. Co. v. Frit Indus.,* 358 F.3d 1312, 1322 (11th Cir.2004) (affirming district court's refusal to allow withdrawal of admissions where trial judge "determined that the offshore insurers were trying to change their litigation position"); *Petrunich v. Sun Bldg. Sys.,* No. 04–2234, 2006 WL 2788208, *4, 2006 U.S. Dist. LEXIS 69043, at *14–*15 (M.D.Pa. Sept. 26, 2006) (preventing withdrawal of admissions where "allowing Defendants to file late responses and assert a different legal theory would necessitate additional discovery,

---

**15.** As will be seen below, even without the admissions the undisputed facts of record make it crystal clear that several of Defen-dants are, in fact, credit repair organizations subject to CROA.

such as depositions" and discovery deadline had already passed).

Were Defendants able to demonstrate an unfair denial of their right to litigate the merits (which they cannot), and thus satisfy the first prong of the Rule 36(b) standard, Plaintiffs' showing of prejudice would still be sufficient on this record to forestall the withdrawal of Defendants' admissions. The First Circuit has explained that

> [t]he prejudice contemplated by [Rule 36(b) ] is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions.

*Brook Vill. N. Assocs. v. Gen. Elec. Co.,* 686 F.2d 66, 70–71 (1st Cir.1982).

The danger of prejudice resulting from the withdrawal of admissions is a special matter for concern where discovery has already run its course based on the premise that the admissions are valid. *Cf. Armstrong v. Executive Office of the President,* 877 F.Supp. 690, 697 n. 8 (D.D.C. 1995), *rev'd on other grounds,* 90 F.3d 553 (D.C.Cir.1996) ("[T]o allow withdrawal of these admissions now would result in prejudice because discovery would have to be reopened...."); *Coca–Cola Bottling Co. v. Coca–Cola Co.,* 123 F.R.D. 97, 107 (D.Del. 1988) (finding prejudice where discovery had already been closed for over a year and opposing party had forgone demanding certain answers at deposition based on admissions); *Branch Banking & Trust Co. v. Deutz–Allis Corp.,* 120 F.R.D. 655, 659 (E.D.N.C.1988) (determining that prejudice would result from withdrawal because, even though discovery had been extended past original scheduled deadline, allowing motion would "interject an entirely new and significant ... issue in the case upon which no discovery has heretofore been undertaken"). *Compare Mfr. Des Montres Jaguar S.A. v. Jaguar Cars, Ltd.,* No. 99–12002, 2001 WL 1442611, **3–4, 2001 U.S. Dist. LEXIS 18623, at *12–*13 (S.D.N.Y. Nov. 15, 2001) (allowing withdrawal where parties ostensibly relying on admissions "do not appear to have abandoned any area of discovery").

Plaintiffs' situation is particularly critical since their belief that the RFAs had been admitted was confirmed when Defendants made no objection to their reliance on those admissions in their motion for class certification in March 2007. *Cf. Tidwell v. Daley,* No. 00–1646, 2001 WL 1414229, *1, 001 U.S. Dist. LEXIS 18491, at *3 (N.D.Ill. Nov. 9, 2001) ("Defendants conducted their discovery [relying on the court's previous ruling that the admissions were valid], and the instant motion was not actively pursued until the time for discovery had expired."); *In re Fisherman's Wharf Fillet, Inc.,* 83 F.Supp.2d 651, 661 (E.D.Va.1999) ("Plaintiff explicitly cited the unanswered admissions in its Motion for Summary Judgment. With the passage of time and as each moment for response to a pleading slipped by, the Claimant's burden for withdrawal of the deemed admissions is raised and the prejudice to the Plaintiff is increased."); *Equal Employment Opportunity Comm'n v. Jordan Graphics, Inc.,* 135 F.R.D. 126, 128–29 (W.D.N.C.1991) (refusing to allow withdrawal where plaintiff had notified defendant of its intention to consider unanswered RFAs to be conceded, defendant still failed to seek withdrawal of admissions for five months, and withdrawal might necessitate "additional discovery and would most likely delay the disposition of [the case]"). Where parties "cannot

depend on the binding effect of admissions obtained under the rule, they cannot safely avoid the time, effort, and expense of preparing proof of the matters of which they have secured admission and the purpose of [Rule 36] is frustrated." *Tidwell,* 2001 WL 1414229, *1, 2001 U.S. Dist. LEXIS 18491, at *3.

Additionally, Plaintiffs describe specific instances of their detrimental reliance on Defendants' admissions. (*See* Dkt. No. 224, Exs. 4, 5.) For example, Request No. 10 relates to the training of BC Mass employees. In order to obtain that information at this point, Plaintiffs would have to track down the employees of a New York business that dissolved four years ago, in 2003. Plaintiffs also allege that they decided against filing a motion to compel answers from Richard Puccio after his deposition testimony proved unresponsive, assuming that they could rely on the subject admissions. (*See generally* Dkt. No. 224, Ex. 11, Richard Puccio Dep.) Presumably the Zimmermans would now have to re-depose Richard Puccio on several issues in order to bolster their arguments.

The prejudice prong of Rule 36(b) was meant to avert just such rushed and arduous efforts to procure evidence. *See Coca–Cola Bottling Co. v. Coca–Cola Co.,* 123 F.R.D. 97, 102 (D.Del.1988). Furthermore, these are just a few examples of the supplemental discovery that Plaintiffs might have to undertake, seven months past the scheduled close of discovery and four years into this protracted litigation.[16]

■ As an alternative to wholesale withdrawal of their admissions, Defendants seek to selectively deny those admissions as to which they argue rescission will not prejudice the Zimmermans' ability to present their case. (*See* Dkt. No. 226.) However, a plaintiff cannot be required to demonstrate individual prejudice, admission by admission, in order to prevent withdrawal of a set of admissions. It is enough, particularly after such a long delay, that Plaintiffs have effectively argued that withdrawal of a significant portion of these admissions will force them to undertake substantial additional discovery efforts before trial.

Whether attributable to negligence or affirmative intent, Defendants' failure to answer properly served requests for admission until almost two years after the fact cannot be excused. Their original inaction may perhaps have been inadvertent, but Defendants offer no explanation of their continuing lack of response that can satisfy the good cause standard of Rule 16(b). *Cf. Ruiz–Rivera v. Internal Revenue Serv.,* 93 Fed.Appx. 244, 246 (1st Cir. 2004). "For Rule 16(b) to operate effectively, litigants cannot be permitted to treat a scheduling order as a 'frivolous piece of paper idly entered, which can be cavalierly disregarded without peril.' "

**16.** Additionally, although reliance on admissions in preparing a summary judgment motion is not on its own enough to support a finding of prejudice under Rule 36(b), *Fed. Deposit Ins. Corp. v. Prusia,* 18 F.3d 637, 640 (8th Cir.1994), it does add to Plaintiffs' argument that withdrawal of Defendants' admissions would undermine their choice of strategy in motion practice and trial preparation. *Compare Galt Capital, LLP v. Seykota,* No.2002–63, 2004 U.S. Dist. LEXIS 22972, at *5–*6 (D.V.I. July 18, 2007) (finding prejudice where withdrawal of admission "could re-quire substantial additional discovery ... [and] could require [the opposing parties] to alter their litigation strategy after they justifiably relied on" the admission); *United States v. Golden Acres, Inc.,* 684 F.Supp. 96, 99 (D.Del.1988) *with Jacobs v. City of West Chester,* No. 97–3409, 1998 WL 849, *1, 1998 U.S. Dist. LEXIS 80, at *3 (E.D.Pa. Jan. 12, 1998) (holding that no prejudice existed where "Defendants did not file any dispositive motions or inalterably commit themselves to a trial strategy in reliance on the unanswered requests").

*O'Connell v. Hyatt Hotels,* 357 F.3d 152, 155 (1st Cir.2004) *(quoting Johnson v. Mammoth Recreations,* 975 F.2d 604, 610 (9th Cir.1992)). Moreover, even if proceeding to trial on the issues covered by these admissions might conceivably enhance the presentation of the merits, it will definitely result in unfair prejudice to Plaintiffs. Therefore, the court finds that Defendants can satisfy neither the Rule 16 nor the Rule 36(b) standard for withdrawal of their admissions and will deny their motion. The RFAs served by Plaintiffs on Defendants CCCC, CBBPC, BCMC, and BC Mass on October 28, 2005, will be deemed admitted. (*See* Dkt. No. 204, Exs. 1, 2.)

## B. *Liability of Defendants Other Than CCCC*

Defendants have moved for summary judgment on the ground that the Zimmermans cannot bring suit against them because they only dealt with CCCC and thus any CROA violations were committed only by CCCC, a company which, as noted above, has been dismissed from the case subsequent to the New York settlement with the Zimmermans. (*See* Dkt. No. 144, Ex. 1.) In support of their position, Defendants point to the *Limpert* court's decision to dismiss CROA claims against certain Defendants in that case where they had not made statements relating to credit repair or contracted with plaintiffs. (Dkt. No. 191, Ex. 5, at 8–9.)

The court expressed its disapproval of a related argument, when Defendants cited it in opposition to Plaintiffs' motion for class certification, and confirms that position here. (*See* Dkt. No. 194.) The *Limpert* decision, occurring early on at the motion to dismiss stage, did not take into account two compelling grounds for permitting Plaintiffs to pursue their claims against the non-CCCC defendants.

■ First, Plaintiffs have brought suit against Defendants in part as "persons" under § 1679b(a)(4) of CROA, which does not predicate liability on CRO status but rather broadly applies to "any person" who

> engage[s], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

15 U.S.C. § 1679b(a)(4). The Puccios were certainly engaged in a "course of business . . . in connection with" CCCC. Plaintiffs have alleged that the Corporate Defendants were also part of CCCC's "course of business," with the Puccios utilizing their individual credit companies as component parts of a larger scheme to defraud debtors. *Cf. Hillis v. Equifax Consumer Servs., Inc.,* 237 F.R.D. 491, 497 (N.D.Ga.2006) (refusing to dismiss a defendant company that had not done business with plaintiff in CROA case because it operated in conjunction with another defendant, from whom plaintiff purchased the product at issue, under agreement providing for joint development, marketing, and sale of the product). In this case, several entities were involved in the course of business because part of their alleged fraud involved channeling revenues from a nonprofit, CCCC, into for-profit companies such as BC Mass and eventually to the Puccios. Services and employees were also traded amongst the Corporate Defendants on a frequent basis as part of the Puccios' credit-related activities, indisputably forming a unitary "course of business."

■ Second, in a related argument, Plaintiffs contend that CCCC, BC Mass, and the other Corporate Defendants served as alter egos of the Puccios and thus may be held directly liable for

CCCC's actions by piercing CCCC's corporate veil. Since funds were funneled out of CCCC to other entities in the Puccios' network and ultimately to the Puccios themselves, the settlement with CCCC could not provide the Zimmermans with full relief and they must now seek their remedy from these other defendants. The corporate form should not serve as an obstacle to that relief where, as here, it was a mere shell, ignored by the Puccios in their everyday business dealings.

■ Massachusetts law permits piercing of the corporate veil under the alter ego doctrine where:

> "there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship" or when "there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." ... In such circumstances, courts may allow a plaintiff to pierce the corporate veil of limited liability in order to "provide a meaningful remedy for injuries and to avoid injustice."

In re Ontos, Inc., 478 F.3d 427, 432 (1st Cir.2007) (citations omitted), cert. denied, Morley v. Ontos, Inc., — U.S. —, 128 S.Ct. 166, 169 L.Ed.2d 33 (2007). Though the alter ego inquiry must be tailored to serve the purposes of CROA, in this case most of the major factors dovetail with that statute's broad targeting of fraud in the credit repair field without regard to attempts to shield such behavior behind legal technicalities. Cf. Zimmerman v. Cambridge Credit Counseling Corp., 409 F.3d 473, 477 (1st Cir.2005) ("Congress cannot have intended unscrupulous credit repair organizations to have ... easy access to CROA immunity.").

Under this inquiry, there is ample evidence for the court to find that the Puccios' credit companies did not function as separate corporations. All were controlled in large part by John and Richard Puccio, without independent representatives active in protecting their individual corporate interests. As CCCC's purchase of BCC's and CCC's dubious "intangible assets" and its payments to Puccio-owned companies that had not provided it with any valuable services demonstrate, this exclusive joint control allowed John Puccio to set the terms of dealing among these companies almost entirely unilaterally. The corporations also shared employees and promotional and informational materials, and marketed themselves as affiliated entities. BC Mass handled CCCC, BCMC, and CBBPC clients without those customers being aware of that fact. The Puccios liberally commingled the finances of the various companies, using the funds of one to pay the bills of others and even their own personal expenses. These facts and others detailed above overwhelmingly demonstrate that the Puccios did not observe the financial, legal, and practical formalities necessary for them to now claim the corporate form as a shield from liability.

For all these reasons, Defendants' claim of entitlement to judgment because Plaintiffs dealt only with CCCC is without merit.

## C. Credit Repair Organizations Act Claim (Count I)

### 1. Definition of a Credit Repair Organization,

CROA defines a "credit repair organization" as:

any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)....

15 U.S.C. § 1679a(3)(A). Defendants argue that they do not fall within this broad category.

Defendants' Rule 36 admissions utterly undercut this argument, since the admissions concede that the Corporate Defendants did "represent[ ] to consumers that [they] could sell, provide, or perform a service in the return for the payment of money for the express or implied purpose of improving the consumer's credit record, credit history, or credit rating." [17] (See Dkt. No. 204, Ex. 1-1, CCCC RFAs at 8 (RFA 17); Dkt. No. 204, Ex. 2, CBBPC/BCMC/BC Mass RFAs at 10, 27, 39 (CBBPC RFA 17, BCMC RFA 17, BC Mass RFA 8).) Even setting aside Defendants' admissions, a brief examination of the undisputed record makes clear that Plaintiffs' motion for summary judgment must be allowed on substantive grounds in any case.

### a. *Representations.*

First, Defendants contend that they did not make any suspect representation to Plaintiffs. They base this argument on the disclaimers contained in the service agreement signed by the Zimmermans.

The contract stated that CCCC made no representations regarding a client's credit rating, which was outside the scope of the contract, and that all representations made and services offered by CCCC were set forth in the agreement. (Dkt. No. 181, Ex. B, Parts VIII, IX.) Defendants claim they cannot be held responsible under CROA for any representations made by CCCC or the Corporate Defendants outside of the four corners of the agreement. The contract itself, the argument runs, promised only that CCCC would consolidate Plaintiffs' debt, use its best efforts to reduce their monthly payments and lower the interest rate on payments, and pay the customer a portion of creditor contributions. (*Id.* ¶¶ 1–4.)

■ However, Defendants' citation of contract law in support of the idea that these written provisions obviate other negotiations or communications between the parties is inapposite. The plain language of CROA demonstrates that Congress intended to cast a wide net in determining what behavior might trigger liability under the statute. Section 1679a covers "*any* person who uses *any* instrumentality of interstate commerce or the mails" not only to actually provide, but even to "*represent* that such person can or will sell, provide, or perform*" the targeted types of service. 15 U.S.C. § 1679a(3)(A) (emphasis added). CROA contains no hint that the legislature intended this definition to be limited to representations cognizable under contract law, and affirmatively contradicts the notion that only those representations contained in the instrumentality of a written and signed agreement can serve as a basis for statutory liability. *See also Fed'l*

---

17. "Admissions made under Rule 36, even default admissions, can serve as the factual predicate for summary judgment." *United States v. Kasuboski,* 834 F.2d 1345, 1350 (7th Cir.1987) (*citing Dukes v. S.C. Ins. Co.,* 770 F.2d 545 (5th Cir.1985); *Donovan v. Carls Drug Co.,* 703 F.2d 650 (2nd Cir.1983)).

*Trade Comm'n v. Gill,* 71 F.Supp.2d 1030, 1044 (C.D.Cal.), *aff'd,* 265 F.3d 944 (2001) (discounting contract disclaimer as way to avoid CROA liability for deceptive representations). Therefore, the court will consider all representations made to the Zimmermans in determining whether either CCCC or BC Mass, in its role as surrogate for CCCC, was a CRO.

### b. *Services Provided.*

Defendants next argue that they did not provide or represent that they would provide any service "for the express or implied purpose of ... improving any consumer's credit record, credit history, or credit rating ...." However, their advertisements, employees, and informational materials undisputedly and repeatedly made statements to consumers indicating that their debt management services would "restore your credit rating" and "improve your credit." [18] These representations were unequivocal, including comments such as the one in the script used to discourage settlement of debts indicating that a DMP "can only help your credit."

Defendants contend that, even though they did make such statements, they cannot be considered credit repair organizations because these services and representations did not qualify them as CROs under the existing interpretation of that statutory term. In support of this argument, Defendants cite a few district court decisions that have imposed judicial limitations on the definition of a "credit repair organization," out of concern that CROA's plain language would otherwise sweep in certain entities whose coverage would not serve the statute's purpose.

*See Hillis v. Equifax Consumer Servs., Inc.,* 237 F.R.D. 491 (N.D.Ga.2006); *Plattner v. Edge Solutions, Inc.,* 422 F.Supp.2d 969 (N.D.Ill.2006); *Wojcik v. Courtesy Auto Sales, Inc.,* No. 01–506, 2002 WL 31663298, 2002 U.S. Dist. LEXIS 22731 (D.Neb. Nov. 25, 2002). These opinions have attempted to articulate a distinction between prospective "credit counseling" services "which endeavor[ ] to gradually improve clients' credit by encouraging creditworthy behavior going forward," and retrospective "credit repair" services "in which the clients are given false hopes of absolution for confessed past credit sins." *Limpert v. Cambridge Credit Counseling Corp.,* 328 F.Supp.2d 360, 364 (S.D.N.Y.2004). According to Defendants, their representations clearly fell in the former category, in that their promise of improved credit was based on the possibility of demonstrating creditworthy behavior in the future through consistent payments under the aegis of a DMP.

Yet, as *Limpert* recognized, "there is a fine line, in advertising and soliciting for credit counseling services to an unsophisticated audience of lower-income debtors, between promising future rewards for creditworthiness, and implying that existing bad credit records may be prematurely expunged." *Id.* (quoted in *Helms v. Consumerinfo.com, Inc.,* 436 F.Supp.2d 1220, 1233 n. 16 (N.D.Ala.2005)); *see also Polacsek v. Debticated Consumer Counseling,* 413 F.Supp.2d 539, 546 (D.Md.2005) ("Depending upon the allegations of the Complaint, a [credit counseling agency ('CCA')] may be covered by CROA, which

---

18. Defendants object that the Zimmermans have not testified that they were exposed to all of the advertising materials discussed here. However, the court may still consider those advertisements in determining Defendants' CRO status since CROA does not require reliance on an entity's representations in order for it to be considered a credit repair organization. *See* 15 U.S.C. § 1679a(3)(A); *Helms v. Consumerinfo.com, Inc.,* 436 F.Supp.2d 1220, 1231 n. 13 (N.D.Ala.2005) (reaching a similar conclusion).

is simply another way of saying that an organization does not necessarily have to be wholly either a credit repair organization or CCA. It may in fact share characteristics of both."). This caution about any mechanical distinction between subject and exempt organizations seems wise given CROA's broad purposes and expansive language. *See generally* 15 U.S.C. §§ 1679–1679b. Accordingly, the *Limpert* court found it could not resolve the status of the defendants before it (who are also parties to this litigation) at the motion to dismiss stage, stating that this mere theoretical distinction between credit counseling and credit repair was "not decisive in finding whether a credit counseling agency may be held liable under the CROA." *Id.* at 365.

▪ Given the additional undisputed factual evidence now available to this court on summary judgment, it is clear that Defendants crossed the boundary from credit counseling into credit repair with their continued and insistent representations to consumers that their services could only help *improve* clients' credit. Defendants trespassed into the forbidden territory of offering hope that their services could somehow allow a "fresh start" despite a past history of poor credit that, by law, could not be erased. *Cf. Helms v. Consumerinfo.com, Inc.*, 436 F.Supp.2d

1220, 1230–31 (N.D.Ala.2005) (holding that company offering only credit monitoring services could qualify as CRO where its advertisements offered the opportunity to "establish" or "rebuild" good credit, "personalized tips that can help you raise your credit score," and the chance to "improve your credit rating"). The ostensibly forward-looking orientation of these representations does not mitigate the obvious message to debtors that Defendant's services might modify the effect of their *past* credit history on their credit score.[19] *See id.* at 1232–33 ("[W]ords like 'establish,' 'rebuild,' 'raise,' and even 'improve,' ... imply that [the defendant's] services will help customers improve their credit ratings.... [E]ven if an organization only 'monitors' credit, yet represents it will improve credit, then it was meant to be covered.").

By contrast, the entities in the cases cited by Defendants made it very clear that they could not help debtors prematurely circumvent their accurate credit history. *Hillis*, discussing a service that allowed customers to simulate the effect of certain actions on their credit histories, emphasized that the defendants' advertisements focused on the benefits of their service as an educational tool regarding how credit works rather than a failsafe method for improving credit.[20] 237 F.R.D. at 516–

---

**19.** As the *Helms* court was careful to make clear, it is irrelevant to the CRO determination whether an organization's representations that its services may improve a consumer's credit are true or false. *Helms*, 436 F.Supp.2d at 1232 n. 15, 1234. The initial inquiry into whether an entity is a credit repair organization is merely the first step towards liability, which a CRO may still avoid by complying with CROA and avoiding deceptive or misleading statements about its services. *See generally* 15 U.S.C. §§ 1679a–1679g.

**20.** In inferring that Congress only intended CROA to apply to backward-looking services

relating to a debtor's past credit record rather than forward-looking programs designed to help them build creditworthy behavior, *Hillis* focused on the specific practices mentioned by Congress in enacting CROA, whereby companies would falsely claim that they could legally eliminate adverse information from customers' credit reports, even *if it were true*, or create new identities for clients with a blank slate as to credit history. 237 F.R.D. at 514. However, it would betray the statute's intent to confine CROA's reach to only those practices that Congress explicitly identified in enacting it. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 592 n. 5, 124 S.Ct.

17. The court also noted that the program did not itself affect customers' credit, merely providing clients with information as to what effect actions on their part might have on their credit scores. *Id.*

*Wojcik* involved a used car dealership that happened to arrange purchase financing for some customers, but did not advertise or otherwise represent that such financing would lead to improved credit aside from a single statement by one employee that making payments on time would help customers build a good credit record. 2002 WL 31663298, **8–9, 2002 U.S. Dist. LEXIS 22731, at *22–*26. In holding that the dealership was not a CRO, the court stated that "common sense alone dictates that a plaintiffs' status as an inexperienced consumer cannot convert a used car dealership into a credit repair organization." *Id.*, 2002 WL 31663298, *8, 2002 U.S. Dist. LEXIS 22731, at *23 (comparing defendant to a company that was found to be a CRO because it represented it could provide car financing for absolutely anyone and could restore good credit).

*Plattner v. Edge Solutions, Inc.* is perhaps the most relevant case, since it also dealt with a company providing debt management services. There, however, the court held that the defendant was not acting as a CRO because it prominently communicated the fact that a customer's credit was outside the control or scope of its services and that it could not guarantee particular results from any of its services. 422 F.Supp.2d 969, 974–76 & 974 n. 4 (N.D.Ill.2006). Ultimately the opinion concluded that "[e]ven an unsophisticated debtor reviewing the program documents could not be left with the impression that [the defendant] was offering to improve his credit except insofar as paying one's debts is likely, ultimately, to have that effect." [21] *Id.* at 976.

---

1236, 157 L.Ed.2d 1094 (2004) (cautioning against narrowing "a prohibition expressed by the unqualified use of a term without any conventionally narrow sense ... so that it covers only instances of the particular practice that induced Congress to enact the general prohibition"). As one court has commented regarding CROA: "While perhaps aimed primarily at pure credit repair organizations, the scope of its language also makes it clearly extendible, under appropriate circumstances, to CCAs. If the language of the Act reaches too far, it is for Congress—not the Court—to take corrective action." *Polacsek v. Debticated Consumer Counseling*, 413 F.Supp.2d 539, 547 (D.Md.2005) (comparing CROA to other statutes that have been interpreted to reach beyond their original targets); *see also Helms v. Consumerinfo. com, Inc.*, 436 F.Supp.2d 1220, 1233 (N.D.Ala.2005) (declining to delve into congressional intent where language of CROA is clear that organizations representing they can "improve" credit fall under statute).

Notably, only the *Hillis* court suggests such a restrictive interpretation of CROA's scope. Both the *Wojcik* and *Plattner* opinions, though concerned with excluding clearly legitimate credit counseling entities from CROA liabilty, gave no indication that their approach was meant to support a general rule exempting any company that managed to veil its deceptive representations regarding its ability to improve credit in the language of forward-looking credit counseling. *Hillis* itself cited a statement by the Federal Trade Commission that warned with respect to a proposed exemption from CROA for credit bureaus (which was never adopted) that "the breadth of the exemption could allow fraudulent credit repair firms to evade the CROA." *Id.* at 515 n. 25. A broad exception for companies offering facially forward-looking services poses the same danger of opening loopholes in the statute's coverage.

21. *Plattner*, like *Limpert*, also recognized a finer distinction between credit counseling and credit repair rather than relying on the rough differentiation between forward- and backward-looking behavior enunciated in *Hillis*. *Plattner* discussed the more nuanced difference between "entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing 'creditworthy behavior' ... which

The fact patterns described in the above cases sharply contrast with Defendants' unremitting and unqualified insistence that using its debt management services would improve a customer's credit, a representation that could not easily be understood by an uninformed debtor to mean only that his or her credit score might go up in response to future creditworthy behavior. Moreover, Defendants offered a service not at issue in *Hillis, Wojcik,* or *Plattner:* the re-aging of debts. Since this practice attempted to convince creditors to forgive fees on late payments and refrain from reporting such late payments to credit bureaus, it was obviously designed to suggest to a debtor that he or she could escape the consequences of past lapses in creditworthy behavior. This service is, in fact, not far from the offers to get credit bureaus to "erase" accurately reported late payments that Congress was trying to regulate when it enacted CROA. *See Hillis,* 237 F.R.D. at 513–14 (describing relevant legislative history). Indeed, the "re-aging" strategy merely takes that practice a step back from the credit bureau level, instead intervening at the earlier stage of creditors' initial reports to the bureaus.

Based on this record, even without their admissions, the court would be compelled to find that the Puccios operated CCCC, BCMC, CBBPC, and BC Mass as CROs. *Cf. Polacsek v. Debticated Consumer Counseling,* 413 F.Supp.2d 539, 548 (D.Md. 2005) (finding that credit counseling agencies were CROs where they promised their services would improve credit by re-aging

accounts, servicing DMPs, and communicating with creditors).

### 2. *Nonprofit Status.*

■ Despite qualifying as a CRO, an entity is not subject to the requirements of CROA if it is a "nonprofit organization ... exempt from taxation under section 501(c)(3)" of the tax code. 15 U.S.C. § 1679a(3)(B)(i). In order to fit within this exception, the First Circuit has held that a CRO "must actually operate as a nonprofit organization *and* be exempt from taxation under section 501(c)(3)." *Zimmerman v. Cambridge Credit Counseling Corp.,* 409 F.3d 473, 478 (1st Cir.2005) (emphasis in original). For the purposes of CROA, " 'nonprofit' status depend[s] primarily on proof that the entity did 'not distribute profits to stockholders or others.' " [22] *Id.* (citation omitted).

■ CCCC is registered as a 501(c)(3) organization with the IRS, making it potentially eligible for the statutory exemption. However, Plaintiffs claim that CCCC did not, in fact and as a matter of law, operate as a nonprofit, disqualifying it from this defense.[23] The court agrees. For example, the Puccios arranged in a non-arms-length transaction for CCCC to pay over $14 million for the dubious intangible assets of BCC and CCC, thus funneling that money to John Puccio as founder and president of the for-profit BCC and CCC. *Cf. Church of Scientology v. Comm'r,* 823 F.2d 1310, 1319 (9th Cir.1987) (sustaining tax court's revocation of church's nonprofit designation in part be-

---

may result in improved actual credit as a collateral consequence, rather than as a program objective." *Plattner,* 422 F.Supp.2d at 975.

**22.** The First Circuit reserved the question of which party bears the burden of proof on the issue of nonprofit status, citing conflicting precedent from several circuits. *Zimmerman,*

409 F.3d at 479 n. 10. This court will also refrain from deciding this issue, as Plaintiffs have offered sufficient evidence to carry the burden even if it does rest on them.

**23.** Notably, Defendants do not oppose the contention that the nonprofit exception does not apply to CCCC in their opposition to Plaintiffs' motion for summary judgment.

cause it made large payments to its founder for "debt repayment" where there was not in fact any evidence of indebtedness). Additionally, CCCC in substantial part took over the activities of for-profits BCC and CCC, hiring their employees and admittedly merely continuing their business but as a registered nonprofit. (*See* Dkt. No. 210, Pls.' Local Rule 56.1 Statement of Uncontroverted Facts ¶ 28; Dkt. No. 218, Defs.' Resp. to Pls.' Rule 56.1 Statement ¶ 28.) CCCC funds were expended on equipment for the Puccios' for-profit businesses and even on personal purchases for the Puccios themselves. *Cf. Graboske v. Comm'r*, T.C.M. (CCH) 262 (1987) (holding that entity was not a nonprofit where its funds were used for the benefit of outside individuals). CCCC also made payments to Puccio-owned businesses where there is no evidence that those companies provided any goods or services to CCCC.

On top of this evidence, Plaintiffs have submitted to this court an Internal Revenue Service report detailing the myriad ways in which CCCC's behavior was not that of a nonprofit and recommending that its 501(c)(3) status be revoked.[24] (Dkt. No. 208, App'x, Ex. M, G. Smith Decl., Ex. 4,

IRS Revocation Letter.) Whatever deference may be due to the legal conclusions of that report, its factual content facilitates an independent finding by this court that CCCC did not operate as a nonprofit organization because it disbursed profits to the Puccios through suspect transactions with their other, for-profit companies.

### 3. CROA Violations.

#### a. CRO Violations.

Once it is established that CCCC, BCMC, CBBPC, and BC Mass do qualify as "credit repair organizations," their violations of the specific statutory requirements of CROA are clear. The Act imposes a number of obligations on credit repair organizations in dealing with consumers. Defendants did not comply with any of these requirements. They did not:

(1) provide consumers with the disclosure statement required by 15 U.S.C. § 1679c(a);

(2) include certain items in their service agreement as mandated by 15 U.S.C. § 1679d, such as "the total amount of all payments to be made by the consumer to the" CRO, "a full and detailed de-

---

**24.** Prominently, CCCC purchased leads and marketing services from other Puccio-owned, for-profit entities, and turned over the task of servicing clients to BC Mass, another Puccio-owned for-profit business. There is no indication of attempts to conduct these interactions at arms length (e.g., by soliciting other companies to perform these services at a lower cost), even when the Puccios engaged in activity such as moving for CCCC to increase the fees it paid to DRC, their marketing company. Moreover, the Puccios received generous salaries of hundreds of thousands of dollars from each of their companies, including CCCC, BC Mass, and DRC, while arranging for these transactions among them. CCCC also paid the sum it owed to BCC and CCC under the intangible asset sale agreement at a far quicker pace than it was required to by contract, at a time when BCC and CCC were giving the Puccios substantial salaries. *Cf.*

*United Cancer Council v. Comm'r*, 165 F.3d 1173, 1176 (7th Cir.1999) ("A charity is not to siphon its earnings to its founder, or the members of its board, or their families, or anyone else fairly to be described as an insider, that is, as the equivalent of an owner or manager."); *Harding Hosp., Inc. v. United States*, 505 F.2d 1068, 1072, 1078 (6th Cir. 1974) (holding hospital to be for-profit partly because doctors who founded it had a "virtual monopoly" over its patients, allowing them to derive "substantial benefit from [its] existence and operation"); *Restland Memorial Park v. United States*, 371 F.Supp. 164, 168 (N.D.Tex. 1974), *aff'd*, 509 F.2d 187 (5th Cir.1975) (declining to allow nonprofit exemption to cemetary business where it was "held out to be and ... functioned as part[] of one integrated business" with other, for-profit corporations owned by the same individual, allowing for-profit entities to trade on its goodwill).

scription of the services to be performed," and a "conspicuous statement" regarding cancellation rights; and

(3) give consumers a separate cancellation form along with the service agreement, 15 U.S.C. § 1679e(b).

Additionally, the CROs violated 15 U.S.C. § 1679b(b) by charging up-front fees to customers before they had fully performed the promised services, in the form of a "Design Fee" assessed upon enrollment in a DMP.[25]

CROA also more broadly bars "any person" from

(3) mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization; or

(4) engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

*Id.* § 1679b (a)(3), (4).

In *Federal Trade Commission v. Gill,* a Central District of California court analogized the task of assessing such representations to the interpretation of advertisements, looking to the " 'overall net impression made by the advertisement' " and whether it was, "taken as a whole, . . . misleading as a matter of law." 71 F.Supp.2d 1030, 1043 (C.D.Cal.1999), *aff'd,* 265 F.3d 944 (9th Cir.2001) (citations omitted). *White v. Financial Credit Corp.* applied the "unsophisticated debtor" standard from the Fair Debt Collection Practices Act in judging the character of representations by whether "a significant fraction of the population would be similarly misled." No. 99–4023, 2001 WL 1665386, *4, *6, 2001 U.S. Dist. LEXIS 21486, at *12, *18 (N.D.Ill.Dec. 27, 2001) (citation omitted).[26]

██ Here, Plaintiffs have demonstrated as a matter of law that Defendants communicated the representation that CCCC was a nonprofit entity. This was a material matter since this factor could reasonably sway a consumer in the decision whether to retain a company, especially in the perilous world of credit services, and appears to have done so in the case of Plaintiffs. It is a matter of record that once Plaintiffs enrolled in a DMP, their account was serviced by BC Mass, a for-profit entity. CCCC's representation in numerous advertising venues that it was a nonprofit would lead any consumer, sophisticated or not, to believe that the credit counseling services they received would be rendered by a nonprofit. Andrew Zimmerman testified that he did in fact rely on that representation. Defendants betrayed Plaintiffs' trust when, as was its policy for all CCCC clients, it transferred Plaintiffs' account to BC Mass, straightforwardly violating § 1679b(a)(3).

---

**25.** Plaintiffs also argue that the disclaimer in the Service Agreement stating that "[t]he CLIENT's credit rating is outside of the scope of this Agreement" constituted an attempt to get consumers to waive their CROA protections in contravention of 15 U.S.C. § 1679f(b). The court declines to decide this issue since Defendants' other violations are more than sufficient to establish statutory liability.

**26.** *But see Helms,* 436 F.Supp.2d at 1236–37 (holding that for a § 1679b(a)(3) "untrue or misleading" claim a plaintiff must provide evidence of "material statements, which would be untrue or misleading in the eyes of the least sophisticated consumer, that were widely disseminated" but that for a § 1679b(a)(4) "fraud or deception" claim, a plaintiff must also show the traditional fraud elements of "individual reliance and damages").

The court need not decide whether the Zimmermans must show that they in fact relied on and suffered damages due to this representation in holding that the Defendants also violated § 1679b(a)(4). The evidence is sufficient to demonstrate that CCCC was, at a minimum, engaged in an "*attempt* to commit ... a fraud or deception," whether or not it succeeded. 15 U.S.C. § 1679b(a)(4) (emphasis added). Defendants admitted that it was their regular practice to have BC Mass take charge of customer DMPs (Dkt. No. 204, Ex. 1–1, CCCC RFAs at 9 (RFAs 28, 29)), meaning that the continued representation that clients would be receiving the services of a nonprofit by enrolling with CCCC was an intentional act, one that CCCC must have known would deceive any debtors who relied on it. *See Helms*, 436 F.Supp.2d at 1237 ("Plaintiff may succeed on [a § 1679b (a)(4) ] claim, without showing individual reliance, ... if he can show specific intent to defraud.").

### b. *Non–CRO Violations.*

Those Defendants that are not themselves CROs within the meaning of CROA—namely, John and Richard Puccio, DRC, CCC, BCC, and Cypress—are still liable for the above violations. As the court has already noted, two theories support this liability: CROA's "course of business" provision and the "alter ego" doctrine. Together these companies, run by the Puccios, engaged in a single overarching scheme to attract customers using CCCC's nonprofit status, charge them upfront fees and otherwise behave in contravention of CROA, and funnel the resulting profits to the Puccios through their entwined finances. Thus the related entities are jointly and severally liable for the damages directly inflicted by CCCC, CBBPC, BCMC, and BC Mass.[27]

### C. *Chapter 93A* (Count II)

■ Since the court holds that, as a matter of law on the undisputed facts, Defendants violated several provisions of CROA, Plaintiffs are also entitled to summary judgment on their claim under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Massachusetts regulations expressly categorize any act or practice that "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes" as a violation of this statute. 940 Mass.Code Regs. 3.16(4). Congress clearly enacted CROA with consumer protection in mind, declaring one of its two statutory purposes to be "protect[ing] the public from unfair or deceptive advertising and business practices" and mandating that a CROA violation be considered a violation of the Federal Trade Commission Act. 15 U.S.C. § 1679(b)(2); 15 U.S.C. § 1679h. Therefore Defendants' noncompliance with CROA's provisions makes them *per se* liable under Chapter 93A.

### D. *Damages*

Plaintiffs have requested actual and punitive damages under CROA, as well as injunctive relief and monetary damages under Mass. Gen. Laws ch. 93A. These issues will be the subject of further pro-

---

27. The "odd man out" with respect to this network of credit companies is Southfork. Plaintiffs have not provided the court with any evidence suggesting that this company, which was apparently involved in equipment resales, had any significant role in the Puccios' credit repair business. Therefore, the court will grant Defendants' motion for summary judgment as to Southfork and dismiss it from the case.

ceedings, once the membership of the protected class has been established.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to withdraw admissions (Dkt. No. 232) and motions for summary judgment (Dkt.Nos.187, 198) are hereby DENIED, except as to Defendant Southfork. As to this Defendant alone, the motions are ALLOWED. Plaintiffs' motion for summary judgment (Dkt. No. 200) as to liability on their CROA and Chapter 93A claims is hereby ALLOWED as to all Defendants except Southfork. The court has previously allowed Plaintiffs' motion for class certification. The clerk will set the case for a status conference to address a timetable for proceedings regarding the issue of damages.

It is So Ordered.