# United States Court of Appeals

## For the First Circuit

No. 04-2039

ANDREW ZIMMERMAN, KELLY ZIMMERMAN
On behalf of Themselves and All Others Similarly Situated,

Plaintiffs, Appellants,

v.

CAMBRIDGE CREDIT COUNSELING CORP., CAMBRIDGE/BRIGHTON
BUDGET PLANNING CORP., CAMBRIDGE CREDIT CORP., BRIGHTON
CREDIT CORP., BRIGHTON CREDIT CORP. OF MASSACHUSETTS,
JOHN PUCCIO, RICHARD PUCCIO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Howard, Circuit Judge,

Cyr, and Stahl, Senior Circuit Judges.

David J. Vendler, with whom Richard H. Nakamura, Maureen M. Home, Morris Polich & Purdy, LLP, Stephen G. Hennessy, Garrett M. Smith, Gary W. Kendall, Michie, Hamlett, Lowry, Rasmussen & Tweel, PC, and Gregory S. Duncan, were on brief, for appellants.
Paul M. Kaplan, with whom Michael J. Tuteur, Lawrence M. Kraus, Stephen D. Riden and Epstein Becker & Green, P.C., were on brief for appellees.

May 31, 2005

**HOWARD**, **Circuit Judge**.  The Credit Repair Organizations Act (CROA or the Act) creates a cause of action for consumers harmed by the unscrupulous business and advertising practices on the part of credit repair organizations.  See 15 U.S.C. § 1679 et seq.  But the Act does not permit lawsuits against "any nonprofit organization which is exempt from taxation under section 501(c)(3)" of the Internal Revenue Code.  See 15 U.S.C. § 1679a(3)(B)(i).  The question we face is whether an Internal Revenue Service (IRS) determination that an entity is tax-exempt under section 501(c)(3) is sufficient to bring the entity within the statutory exclusion set forth in § 1679(a)(3)(B)(i).

## I.

Saddled with substantial debt, the plaintiffs, Andrew and Kelly Zimmerman, sought assistance from Cambridge Credit Counseling Corporation (Cambridge) near the end of 2001.[1]  The plaintiffs had seen advertising from Cambridge claiming that it could help debtors obtain lower interest rates, eliminate fees, re-age debt, and otherwise assist in debt management efforts.  The plaintiffs say that they were drawn to Cambridge because it identified itself as a nonprofit organization.  This led the plaintiffs to believe that Cambridge would charge low fees for its services.  Cambridge is

---

[1]As this appeal arises from the grant of the defendants' motion to dismiss, we accept the well pleaded allegations in the complaint as true.  See Viqueira v. First Bank, 140 F.3d 12, 15 (1st Cir. 1998).

organized as a charitable organization under Massachusetts law, see Mass. Gen. Laws ch. 180, and has obtained an IRS determination that it is tax-exempt under section 501(c)(3) of the Internal Revenue Code, see 26 U.S.C. § 501(c)(3).[2]

In early 2002, the plaintiffs enrolled with Cambridge. For a fee of $948 per month, Cambridge developed a customized debt management program for them. Several months later, the plaintiffs cancelled their contract with Cambridge after they became dissatisfied with its services. At the time of cancellation, the plaintiffs owed more money and had worse credit scores than before contracting with Cambridge. Believing that they had been swindled, the plaintiffs sued Cambridge, its owners John and Richard Puccio, and several related entities for violations of the CROA.[3] They alleged that Cambridge was subject to suit under the Act because its claimed nonprofit status was a sham.

---

[2]Section 501(c)(3) specifies that, inter alia, charitable and educational organizations, whose net earnings do not benefit shareholders or individuals, are exempt from federal taxation. See 26 U.S.C. § 501(c)(3).

[3]The plaintiffs also sued under the Fair Debt Collection Practices Act, see 15 U.S.C. § 1692, and state law. The district court dismissed the Fair Debt Collection Practices Act claim on statute of limitations grounds and declined to exercise jurisdiction over the state law claims under 28 U.S.C. § 1367(b). See Zimmerman v. Cambridge Credit Counseling Corp., 322 F. Supp. 2d 95, 98 & 101 (D. Mass. 2004). The plaintiffs have not appealed these rulings.

The defendants moved to dismiss the complaint on the ground that Cambridge was a section 501(c)(3) tax-exempt organization and therefore within the exclusion specified in 15 U.S.C. § 1679a(3)(B)(i). The district court agreed and dismissed the CROA claim. See Zimmerman, 322 F. Supp. 2d at 99-101. The court found the CROA exclusion applicable because the IRS had determined that Cambridge qualified for section 501(c)(3) tax-exempt status. See id. The court based its interpretation principally on a policy rationale. It concluded that permitting courts to "go behind the IRS's designation and proceed to make their own independent determinations, on a case-by-case basis, of an entity's substantive classification according to section 501(c)(3)" would create excessive uncertainty concerning the validity of an entity's tax-exempt status, and that this uncertainty could destabilize the operation of the nonprofit sector. See id. at 100. The plaintiffs timely appealed.

**II.**

Our review of the district court's grant of the motion to dismiss is de novo.[4] See Goldings v. Winn, 383 F.3d 17, 21 (1st Cir. 2004). At issue is the reach of 15 U.S.C. § 1679a(3)(B)(i),

---

[4]The parties dispute whether the defendants' motion should have been raised under Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6). This dispute is immaterial because the parties agree that either way we must accept the well pleaded allegations as true and consider the interpretive question de novo.

-4-

which provides that "a credit repair organization does not include any nonprofit organization which is exempt from taxation under section 501(c)(3)" of the Internal Revenue Code.  15 U.S.C. § 1679a(3)(B)(i).  The plaintiffs argue that the exclusion requires (1) that the credit repair organization actually operates as a nonprofit entity and (2) that the credit repair organization meets the eligibility requirements in in section 501(c)(3) of the tax code.  The defendants respond that the phrase "exempt from taxation under section 501(c)(3)" defines "nonprofit organization." Therefore, the defendants contend that a credit repair organization must only have received section 501(c)(3) from the IRS to qualify for the exclusion.

"As in any case of statutory construction, our analysis begins with the language of the statute." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (internal quotation marks and citation omitted).  The Act qualifies a large group of entities for the exclusion -- all nonprofit organizations -- and then limits the excluded group to a smaller group of nonprofit organizations "which are tax-exempt under section 501(c)(3) . . . ." 15 U.S.C. § 1679a(3)(B)(i).  The most natural reading of the text is that it establishes two requirements.  The nonprofit language excludes some entities from eligibility (namely, profit making entities), and the "tax-exempt" language distills the excluded group to the kinds of organizations identified in section 501(c)(3) (e.g., charitable or

-5-

educational organizations) which are, in fact, tax-exempt. Read in this way, the Act does not define "nonprofit organization" as an entity with section 501(c)(3) status but rather establishes two independent criteria for the exclusion: nonprofit status and section 501(c)(3) status.

This plain reading of the exclusion is supported by the surrounding text. See Massachusetts v. Morash, 490 U.S. 107, 115 (1989). In addition to excluding nonprofit organizations with section 501(c)(3) status, the CROA excludes creditors and depository institutions. But as to these latter exclusions, Congress defined the excluded entities by reference to another section of the United States Code. See 15 U.S.C. § 1679a(3)(B)(ii) (excluding "any creditor (as defined in section 1062 of this title)"); 15 U.S.C. § 1679a(3)(B)(iii) (excluding "any depository institution (as that term is defined in section 1813 of Title 12)"). Had the drafters of the CROA intended to define "nonprofit" simply by reference to section 501(c)(3) of the Internal Revenue Code, they had at their disposal a method for doing so unambiguously -- a method they employed for other exclusions under the CROA. See King v. St. Vincent's Hosp., 502 U.S. 215, 220-21 (1991).

This drafting choice cannot be considered accidental because the United States Code is replete with statues which clearly define a "nonprofit organization" as an entity that is tax-

-6-

exempt under the Internal Revenue Code.  Indeed, several statutes expressly define a nonprofit organization to mean an organization described under section 501(c) of the Internal Revenue Code.  See, e.g., 5 U.S.C. § 3102(a)(3) (stating that "'nonprofit organization' means an organization determined by the Secretary of the Treasury to be an organization described in section 501(c) of the Internal Revenue Code of 1986"); 16 U.S.C. § 1447a(5) (similar); 29 U.S.C. § 2703(4) (similar); 42 U.S.C. § 1485(w)(1)(B) (similar); 42 U.S.C. § 1760(d)(5) (similar); 42 U.S.C. § 5603(23) (similar).[5]  This construction links the definitional term "nonprofit" directly to the organization's federal tax-exempt status.  We may assume that, when drafting the CROA, Congress was aware of this archetypal language for equating nonprofit status with federal tax-exempt status.  See S. Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351 (1998).  Yet Congress chose a different formulation for the CROA. This is strong evidence that Congress did not intend to conflate nonprofit status with section 501(c)(3)tax-exempt status.[6]

The plaintiffs' interpretation of the exclusion also honors the principle "that '[a]ll words and provisions of statutes

---

[5]These statutes predate the enactment of the CROA.

[6]The legislative history is inconclusive.  The only mention of the exclusion appears in the House of Representatives Ways and Means Committee report from the Congress preceding the one that enacted the CROA.  H.R. Rep. No. 103-486 (1994), 1994 WL 164513.  This report states that the definition of a credit repair organization "does not include a nonprofit organization."  Id.

are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous.'" United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985)). The defendants read the exclusion as if it said only that the CROA excludes any organization "which is tax-exempt under section 501(c)(3). . . . " They have ascribed no independent meaning to the term "nonprofit."

Additionally, the plaintiffs' reading is consonant with the rule favoring the narrow construction of exclusions in remedial statutes. See Hogar Agua Y Vida En El Desierto, Inc. v. Suarez-Medina, 36 F.3d 177, 182 (1st Cir. 1994). Congress enacted the CROA to remedy abuses in the credit repair industry. The Act includes a finding by Congress that "[c]ertain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters." 15 U.S.C. § 1679(a)(2). The CROA's expressed purpose is to "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2). Its remedial goal is thus unmistakable. See Fed. Trade Comm'n v. Gill, 265 F.3d 944, 949-50 (9th Cir. 2001).

If a credit repair organization only needed to obtain a section 501(c)(3) designation to qualify for the exception, the exception might well eviscerate the liability-creating provisions. See generally Marta Lugones Moakley, Credit Repair Organizations After Regulation, 77-AUG Fla. B.J. 28, 33 (2003) (describing the increase in credit repair organizations seeking section 501(c)(3) status after the passage of the CROA). After all, the IRS usually grants section 501(c)(3) status based solely on representations made by the applying entity. See IRS Form 1023. In fact, the IRS' subsequent notification that an entity has qualified for tax-exempt status contains a disclaimer stating that the IRS has made its determination based solely on representations provided to it by the party seeking the status. See Letter from IRS District Director to Cambridge Credit Counseling Corp. of 2/12/98 at 1 (stating that section 501 (c)(3) status is granted "based on information supplied, and assuming [that] operations will be as stated in your application for recognition of the exemption"). And the determination is not binding in subsequent litigation challenging the applying entity's tax-exempt status. See 26 U.S.C. § 6110(k)(3) (stating that "a written determination [from the IRS] may not be cited as precedent"). Congress cannot have intended unscrupulous credit repair organizations to have such easy access to CROA immunity. Cf. Edsen v. Bank of Boston, 229 F.3d 154, 177 (2d Cir. 2000) ("An erroneous ruling by an IRS key district

director, especially when procured by submission of limited or confusing information, cannot defeat the express statutory rights of [consumers]. The adjudication of those rights is for the federal courts, not the field offices of the IRS.").

The district court rejected the plaintiffs' interpretation of the exclusion out of understandable concern that permitting a court to decide whether an entity is actually operating as a nonprofit organization will substantially destabilize the nonprofit sector. See Zimmerman, 322 F. Supp. 2d at 99-100. The concern is two-fold. First, it will unsettle the expectations of the tax-exempt organization and those interacting with it if section 501(c)(3) status can be lost in non-tax related litigation. Second, subjecting a nonprofit organization to litigation over its status will significantly raise its cost of doing business. Two responses to these concerns immediately suggest themselves.

First, a determination that an organization is not operating as a nonprofit for purposes of the CROA will not directly impact the organization's tax-exempt status under section 501(c)(3). Whether an entity is entitled to federal tax-exempt status is a determination that is committed, in the first instance, to the IRS. See Bob Jones Univ. v. United States, 461 U.S. 574, 596-97 (1982). True, a determination under the CROA that a credit repair organization is not operating as a nonprofit will likely

catch the attention of the IRS.  But there are already processes

for alerting the IRS to improvident grants of tax-exempt status.

There is a procedure for the IRS to field complaints about an

entity's abuse of its tax-exempt status.  See

www.irs.gov/compliance/enforcement (last visited May 5, 2005).

Moreover, Congress itself occasionally holds hearings on the

matter.[7]  Thus, a finding that a credit repair organization is not

operating as a nonprofit for purposes of the CROA will be just

another source of information from which the IRS can decide to

target a particular credit repair organization for review.  But

such a finding will not mean that a credit repair organization

loses its tax-exempt status without further action by the IRS.[8]

Second, it is already common for courts and

administrative agencies to examine whether an entity actually

---

[7]Indeed, Congress has held hearings on the abuse of tax-exempt status by credit counseling and repair organizations.  See Section 501(c)(3) Credit Counseling Organizations:  Hearing Before the House of Representatives Ways and Means Subcommittee on Oversight, 108th Cong. (2003); Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling: Hearing Before the Senate Governmental Affairs Subcommittee on Investigations, 108th Cong. (2004).  The IRS has responded with an initiative to review the granting of tax-exempt status in this industry.  See IRS Fact Sheet 2003-17, IRS Takes Steps to Ensure Credit Counseling Organizations Comply with Requirements for Tax-Exempt Status (Oct. 2003).

[8]In any event, even if a determination under the CROA could directly impact an organization's tax-exempt status, it would not typically affect the interests of those doing business with it.  See Letter from IRS District Director to Cambridge of 2/12/98, at 1 (stating that "contributors may rely on determination [of tax-exempt status] unless the Internal Revenue Service publishes notice to the contrary").

-11-

operates as a nonprofit, irrespective of its tax-exempt status. For example, the Federal Trade Commission, which does not have jurisdiction over nonprofit organizations, see 15 U.S.C. §§ 44 & 45(a), determines, without reference to a target organization's tax-exempt status, whether the organization in fact operates as a nonprofit and is therefore beyond its jurisdiction. See In re Ohio Christian Coll., 80 F.T.C. 815, 848-49 (1972). Similarly, state courts frequently inquire into whether an entity actually operates as a nonprofit to determine whether the entity is entitled to tax-exemptions reserved for nonprofits. See, e.g., W. Mass. Lifecare Corp. v. Bd. of Assessors, 747 N.E.2d 97, 103 (Mass. 2001) ("The mere fact that the organization . . . has been organized as a charitable corporation does not automatically mean that it is entitled to an exemption for its property. Rather, the organization must prove that it is in fact so conducted that in actual operation it is a public charity.") (internal quotation marks and citations omitted).[9]

---

[9]In addition to relying on the district court's policy rationale, the defendants contend that their interpretation of the exclusion is superior because of the rule of construction providing that a specific term in a statute (viz. "exempt from taxation under section 501(c)(3)") governs over a more general term (viz. "nonprofit organization"). See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992). But this rule of interpretation applies only "where there is inescapable conflict between" the statute's terms. 2A Norman J. Singer, Sutherland on Statutes and Statutory Construction § 46.05, at 177 (2000). Because the interpretation we adopt gives different meanings to "nonprofit" and "exempt from taxation under section 501(c)(3)," this rule of

In sum, to be excluded from the CROA under 15 U.S.C. § 1679a(3)(B)(i), a credit repair organization must actually operate as a nonprofit organization <u>and</u> be exempt from taxation under section 501(c)(3). Having reached this conclusion, we must identify the standard to be applied in deciding whether an entity satisfies the "nonprofit" component of the exclusion.

Where Congress left "nonprofit" undefined in an exclusion from another statutory scheme, we concluded that "nonprofit" status depended primarily on proof that the entity did "not distribute profits to stockholders or others." <u>See</u> <u>Town of Brookline</u> v. <u>Gorsuch</u>, 667 F.2d 215, 221 (1st Cir. 1981). This is consistent with the standard definition of the term: a nonprofit corporation is "a corporation organized for some purpose other than making a profit." Black's Law Dictionary at 367 (8th ed. 1999); <u>see also</u> Bruce Hopkins, <u>The Law of Tax-Exempt Organizations</u> 5 (8th ed. 2003) (A "nonprofit organization . . . is not permitted to distribute its profits . . . to those who control it . . . ."). Here, we apply the standard defintion.

For motion to dismiss purposes, the plaintiffs' complaint sufficiently alleges that Cambridge was not, in fact, operating as

---

construction does not apply.

a nonprofit organization.[10]  The complaint states that, while Cambridge claimed that its purpose was "to provide direct aid to financially distressed debtors," in reality "Cambridge's primary purpose was to make money for its owners and operators, John and Richard Puccio."  The complaint further claims that the Puccios never intended to operate Cambridge as a nonprofit, but rather intended to use it "to enrich themselves and their key executives by permitting them to siphon off corporate assets of their business through huge compensation packages."  In support of this allegation, the complaint alleges that the Puccios and their key executives have received exorbitant salaries from Cambridge.  These allegations, if true, could support a finding that Cambridge was not actually operating as a nonprofit organization and is therefore subject to the CROA.

### III.

For the reasons stated, we **vacate** the judgment and **remand** for proceedings consistent with this opinion.

**So ordered**.

---

[10]The parties have not briefed which side has the burden of proof on this issue.  The majority view is that the burden rests with Cambridge. See United States v. Columbus Country Club, 915 F.2d 877, 881-82 (3d Cir. 1990); United States v. Lansdowne Swim Club, 894 F.2d 83, 85 (3d Cir. 1990); Quijano v. Univ. Fed. Credit Union, 617 F.2d 129, 132 (5th Cir. 1980); Nesmith v. YMCA, 397 F.2d 96, 101 (4th Cir. 1968).  But there is contrary authority. See EEOC v. Chicago Club, 86 F.3d 1423, 1429 (7th Cir. 1996).  We do not take a position on this question because, even if the plaintiffs shoulder the burden of proof, their complaint is adequate for motion to dismiss purposes.

-14-