# United States Court of Appeals
## For the First Circuit

No. 09-1416

ANDREW ZIMMERMAN; KELLY ZIMMERMAN, On Behalf of Themselves and
All Others Similarly Situated,

Plaintiffs, Appellees,

v.

JOHN PUCCIO; RICHARD PUCCIO,

Defendants, Appellants,

CAMBRIDGE CREDIT COUNSELING CORP.; CAMBRIDGE/BRIGHTON BUDGET
PLANNING CORP.; DEBT RELIEF CLEARINGHOUSE, LTD.; CAMBRIDGE CREDIT
CORP.; CYPRESS ADVERTISING AND PROMOTIONS, INC.; BRIGHTON CREDIT
CORP.; BRIGHTON DEBT MANAGEMENT SERVICES, LTD.; BRIGHTON CREDIT
CORP. OF MASSACHUSETTS; CAMBRIDGE CONSUMER CREDIT INDEX, INC.;
SOUTHFORK ASSET MANAGEMENT CORP.; CAPITAL ONE BANK; CAPITAL ONE
CREDIT CARD SERVICES; CAPITAL ONE F.S.B.; CHASE MANHATTAN BANK
U.S.A.N.A.; JPMORGAN CHASE & CO.; PROVIDIAN BANCORP SERVICES;
PROVIDIAN BANK; PROVIDIAN FINANCIAL CORPORATION; USAA FEDERAL
SAVINGS BANK; USAA SAVINGS BANK; FIRST CONSUMER CMC CORP.,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Michael A. Ponsor, U.S. District Judge]

---

Before

Lipez, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

---

Charles P. Kindregan, with whom Nancy L. Perlman and Looney &

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Grossman LLP were on brief, for appellants.

David J. Vendler, with whom Richard H. Nakamura, Jr., Maureen M. Home, Morris Polich & Purdy LLP, G. Oliver Koppell, John F. Duane, Daniel F. Schreck, Law Offices of G. Oliver Koppell, Stephen G. Hennessy, Gregory S. Duncan, Garrett Minor Smith, Michie Hamlett Lowry Rasmussen & Twell, Joseph Seth Tusa, and Whalen & Tusa, P.C., were on brief, for appellees.

---

July 27, 2010

---

**LIPEZ**, <u>Circuit Judge</u>. Appellants John and Richard Puccio appeal from the district court's grant of summary judgment to the plaintiffs, Andrew and Kelly Zimmerman, on behalf of a class of clients of Cambridge Credit Counseling Corporation ("Cambridge"), one of the Puccios' business enterprises, pursuant to the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j. CROA was enacted by Congress in 1996 to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

Although the district court entered summary judgment against the Puccios and multiple corporate defendants for violations of CROA, the corporate defendants have not appealed. Instead, the Puccios appeal the judgment against them personally for the violation of two provisions of CROA, the first making it unlawful to "make or use any untrue or misleading representation of the services of the credit repair organization," <u>id.</u> § 1679b(a)(3), and the second making it unlawful to "engage . . . [in a] course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization," <u>id.</u> § 1679b(a)(4).

The Puccios argue that they do not fall within the ambit of CROA because Cambridge, their credit counseling enterprise, does not qualify as a "credit repair organization" as defined by the

Act. They also argue that the district court erred in piercing the corporate veil when it found them liable for violating Section 1679b(a)(4). Finally, in their primary argument directed at their substantive liability under Section 1679b(a)(3), the Puccios argue that the district court did not, in fact, find them liable under the "misleading representation" provision, id. § 1679b(a)(3). Alternatively, if the district court did find them liable under (a)(3), the Puccios argue (but only barely) that the district court again erred in piercing the corporate veil.

After careful consideration, we affirm the district court's grant of summary judgment for the plaintiffs. We conclude that Cambridge was a "credit repair organization" within the meaning of CROA. We also conclude that the district court unambiguously held the Puccios liable for misleading representations under Section 1679b(a)(3) of CROA, and we affirm that finding of liability based on the court's piercing the corporate veil analysis. We do not reach the Puccios' liability under Section 1679b(a)(4), and their attendant arguments about the summary judgment standard and corporate veil-piercing, because the Puccios' liability under Section 1679b(a)(3) fully supports the district court's grant of summary judgment.

**I.**

In this appeal from the district court's grant of summary judgment for the plaintiffs, we must recite the material facts in

the light most favorable to the party opposing summary judgment, in this case, the defendants. Torres Vargas v. Santiago Cummings, 149 F.3d 29, 30 (1st Cir. 1998). Nonetheless, that requirement has less significance here because we draw much of our recitation of the facts from the plaintiffs' statement of material facts, which forms part of the undisputed record on appeal. It is undisputed because the district court deemed the plaintiffs' statement of facts admitted in the absence of proper opposition by the defendants pursuant to the District of Massachusetts Local Rule 56.1. Zimmerman v. Puccio, 529 F. Supp. 2d 254, 258 n.3 (D. Mass. 2008) ("It must be noted that Defendants failed properly to dispute many of Plaintiffs' proffered facts. . . . In such instances, the court has taken the Plaintiffs' account as true."). The rule requires that a party's opposition to a motion for summary judgment include a "concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. Local R. 56.1. In the absence of such a statement, "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties." Id.

We have reiterated the importance of such rules to the district courts in preventing litigants from shifting the burden of organizing evidence to the district court, and "we treat the

district court's decision to apply [them] with deference." Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 31 (1st Cir. 2010). In this case, the defendants' failure to provide any citations whatsoever in their opposition statement leaves no doubt as to their noncompliance. That the parties filed cross motions for summary judgment does not affect either party's obligation to comply with the local rule. See P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 132 (1st Cir. 2010) ("A party cannot circumvent the requirements imposed by an anti-ferret rule simply by filing a cross-motion for summary judgment and expecting the district court to do its homework."). The defendants offer no other reason why we should revisit the district court's decision to deem the facts in the plaintiffs' statement to be admitted and we decline to do so.[1]

## A. The Puccio Companies

### 1. Corporate Structure

---

[1] Due to the defendants' failure to respond to the plaintiffs' requests for admissions for almost two years, a period well beyond that required by rule, the district court also deemed them to have admitted the facts in the plaintiffs' requests for admissions. Zimmerman, 529 F. Supp. 2d at 271. Because we find that the district court was well within its discretion to deem the plaintiffs' statement of facts admitted, and that the facts therein provide an ample basis for affirming the judgment, we need not rely on - or reach the legal issues surrounding - the deemed requests for admissions. To the extent that any fact put forward in the deemed statement of facts relies for record support on the requests for admissions, we do not treat that fact as admitted.

In the early 1990s, John Puccio controlled several entities doing business in the arena of debt management.[2] He started Cambridge Credit Corp. ("CCC"), a New York corporation, in 1993. Later that year, he founded Brighton Credit Corp. ("BCC"), also in New York. He served as president of both for-profit corporations. The companies shared office space and employed almost identical client contracts.

After CCC and BCC were ordered to cease operating by the New York Banking Department in 1996,[3] John Puccio decided to move his operations to Massachusetts and start a non-profit organization. He and his brother Richard co-founded Cambridge, which adopted the Service Agreements used previously by for-profits BCC and CCC. It provided the same debt management service as did those companies and employed their staff. As he had for BCC and CCC, John Puccio served as president of the company. Richard Puccio was Cambridge's Vice President and strategic planner. He was also a board member of the company. In 1996, John Puccio filed papers to register Cambridge as a nonprofit entity under Massachusetts law and as a 26 U.S.C. § 501(c)(3) non-profit entity under federal law.

---

[2] For reference, we have created an Appendix listing the entities, their acronyms, location and status.

[3] The order concluded that the two companies were acting in violation of prohibitions in New York law on for-profit entities conducting "budget planning" business and on conducting a "money transmission business without an appropriate license."

Shortly after the formation of Cambridge, John Puccio arranged to have the new company purchase the "intangible assets" of BCC and CCC for $14.1 million. Although the Intangible Asset Sale Agreement purported to convey to Cambridge the goodwill in the trademarks and copyrights of BCC and CCC, neither company had been issued any trademarks or copyrights at the time of the purchase. Moreover, the sale was concluded without negotiation and in the absence of independent representation for Cambridge.

Around the same time, John Puccio also founded Cambridge/Brighton Budget Planning Corporation ("CBBPC") in New York as a "credit counseling" agency and another "credit counseling agency," Brighton Credit Management Corp. ("BCMC"), a Florida entity. Both were controlled by John Puccio, who handled day-to-day operations and hiring and oversaw the general operations of the businesses. They used service agreements virtually identical to the Puccios' other concerns and advertised their affiliation with each other and with Cambridge.

All three companies, Cambridge, CBBPC, and BCMC, got "back office support" for their operations from yet another Puccio entity, Brighton Credit Corp. of Massachusetts ("BC Mass").[4] BC

_____

[4] BC Mass changed its name to Brighton Debt Management Services, Inc. in 2003. Still later, it changed its name to First Consumers. BC Mass was jointly owned by John and Richard Puccio. After the first name change, John Puccio became listed as the sole shareholder and president of the company. Defendants conceded that "the businesses were essentially the same from Brighton Credit of Mass to Brighton DMS to First Consumers." For the purposes of this

-8-

Mass worked exclusively for the three Puccio companies. It did not have clients of its own, but performed all mailing, correspondence, ongoing customer services, and record-keeping services in connection with the debt management service being sold by the other Puccio companies. It also handled Cambridge's "Good Payer" program and took care of all other matters related to client accounting, including the central function of communicating with creditors in order to achieve the re-aging[5] of client accounts. If a client called the phone number provided by Cambridge, a BC Mass employee would answer.

John and Richard Puccio created and controlled several additional companies. For example, Debt Relief Clearinghouse Ltd., was the marketing arm of the Puccio organization, while Cypress Advertising and Promotions, Inc., placed advertisements for the Puccio credit companies. All of the businesses shared employees and office space, and the managers of one company supervised employees of the others.

The Puccios treated their companies interchangeably. They charged expenses for one company to the credit card of another, while paying the bill with a check from yet another of the corporations. At least one person who worked for CCC, Cambridge

_____

opinion, we refer to all iterations of that entity as BC Mass.

[5] As we discuss in greater detail later in this opinion, re-aging accounts involves negotiating with creditors to re-label past due accounts as current.

and BC Mass at different times directly received the bank statements and paid the bills of one Puccio company while he was not an employee of that company, but instead worked for a different Puccio enterprise. While John Puccio was running Cambridge, the company paid large sums of money to other Puccio-controlled companies without consideration. For example, JRJ Associates, Inc., a company owned by John and Richard Puccio, was paid at least $150,000 by Cambridge. John and Richard Puccio also purchased personal items with corporate funds. Personal charges from a "gentleman's club" and for a yacht appeared on the Puccio companies' corporate credit card bills.

The Puccios paid themselves salaries from their corporations. In 2001 and 2003, they were each paid $624,000 by Cambridge. John Puccio was paid $648,000 in 2004. His total salary from his credit companies for the period from 1996 to 2004 was $30,987,572, while Richard Puccio's aggregate compensation was $21,719,908.

2. Corporate Services

Cambridge, CBBPC and BCMC created individualized Debt Management Plans ("Debt Plans") for clients. Customers were charged an up front "Design Fee" for the development of the Debt Plan equal to the amount of one monthly payment as well as a ten percent monthly fee or twenty-five dollars, whichever was greater. The plans would set a single monthly payment to be paid by the

-10-

client to the particular Puccio enterprise servicing that client, which would then be dispersed to the client's creditors. The Puccio companies would also negotiate with a client's creditors for better terms on their debt through interest rate reductions or decreases in principal. They would also attempt to "re-age" clients' accounts by convincing creditors who were owed late payments to re-label the accounts as current. In exchange for re-aging, the Puccio company would commit its customers to making payments on the account for a set amount of time.

The IRS form accompanying Cambridge's application for 501(c)(3) status, which was signed by John Puccio, stated that the company's clients would enjoy "Improved Credit Rating." On its tax returns in 2000, 2001 and 2003, Cambridge described the principal objective of its Debt Management Program as including "improv[ing] a consumer's credit rating over time by establishing a consistent payment history."

Cambridge, BCMC and CBBPC advertised their ability to improve a client's credit. The three companies' promotional materials made promises such as "we can help you . . . restore your credit rating," and "[w]hen you join our debt management program, we'll be able to help you reestablish your credit." The company sent out a quarterly newsletter containing advice on how "to rebuild your credit." Cambridge's website stated that "by taking advantage of our Debt Management Program, we can help you . . . Re-

establish Your Credit."  The website also had a feature called "Cambridge Answer Man" to "help people understand the often confusing world of credit."  A customer who used this feature would be able to click for answers to questions such as "How Can I Rebuild My Credit?"  The welcome package sent to clients after they enrolled with Cambridge contained a section entitled "A Fresh Start."  The materials asserted, "that is exactly what you have received by joining our program" and listed "an improved credit profile" among the "life benefits" received by clients using Cambridge's program.

The contract sent to clients contained disclaimers that stated:

> The CLIENT understands that CAMBRIDGE makes no representation about any aspect of the CLIENT'S credit rating.  Creditors will sometimes report participation in CAMBRIDGE's program as a "consumer credit counseling" item on your credit report.  Persons with perfect credit histories may have their credit record adversely affected.  CAMBRIDGE has no control over reporting or interpretation, as it is strictly a creditor and lender decision.  The CLIENT's credit rating is outside the scope of this Agreement, however, at the CLIENT's request, CAMBRIDGE will provide CLIENT with credit references based upon CLIENT's payment history with CAMBRIDGE.
> . . .
> CAMBRIDGE has not authorized any person or other company to make representations on its behalf concerning fees, credit, any services to be performed by CAMBRIDGE or any other matter.  In the event you were referred to CAMBRIDGE by another company, you understand that the other company was not authorized to make any representations about

> CAMBRIDGE or its services. You agree that all the representations concerning fees, credit, refinancing or any services to be performed by CAMBRIDGE that were made by CAMBRIDGE or relied upon by you when you signed this Service Agreement are set forth in this Agreement. . . . All the obligations of CAMBRIDGE are set forth in this agreement.

Employees of BC Mass, who responded to phone calls from Cambridge, BCMC and CBBPC's clients, were trained to speak about the benefits of re-aging accounts. All employees were coached to answer questions about how joining a Debt Plan might affect a client's credit score. The sales scripts used by the Puccio companies directed their employees to tell clients,

> You're already behind with the bills so this can only help your credit. By making your payments on time to us we will be able to bring your accounts back to a current status, plus establish a credit reference to back you up when you apply for future financing.

Depending on how far behind a client was, the script instructed an employee to tell the client, "[s]o long as you follow through with the program it can only help not hurt."

If a client inquired about settling his or her accounts, the Puccio employee was directed to say,

> settlements can damage your credit almost as much as a bankruptcy . . . Our program is designed to get you out of debt and protect your credit rating . . . Over the course of the program your credit rating will improve, making it easier to qualify for financing in the future.

If the client persisted, the script required that the employee respond,

> Our program is designed to help you get out of debt and improve your credit rating. You will reestablish a good payment history and improve your debt to income ratio. Over the course of the program your credit rating will improve.

Employees were directed to closely follow the scripts, and they were evaluated on how well they adhered to them. Their compensation, at least for a time, was linked to how many customers they enrolled because they were paid a commission from the initial fees paid by clients. At Cambridge, employees could earn bonuses for high sales, while low sales volumes were penalized.

**B. The Zimmermans**[6]

Andrew and Kelly Zimmerman are a married couple. In late 2001, they learned about Cambridge through radio, television, and internet advertisements. Attracted to the company's non-profit status and hopeful that it could help the couple deal with their debt, Andrew Zimmerman called Cambridge's toll-free number. He was eventually faxed a five-page Service Agreement, which he signed. The agreement provided that Cambridge would consolidate the Zimmerman's monthly payments into a single payment, use its best efforts to reduce the amount of the monthly payment and the

---

[6] Although the plaintiffs' filings indicate that their surname is spelled "Zimmermann," we, like the district court, continue to use the incorrect spelling for consistency among the multiple opinions arising from this action.

-14-

interest rates being paid to creditors, and pay the Zimmermans a portion of creditor contributions obtained through Cambridge's "Good Payer Program."[7]

When the Zimmermans returned the contract to Cambridge, the company offered them a proposed Debt Plan with a monthly payment of $798.00. The Zimmermans enrolled in the Debt Plan. In return for its services, as described above, Cambridge charged a "Design Fee" in the amount of one monthly payment and a monthly payment processing fee of ten percent or twenty-five dollars, whichever was greater.

Without their knowledge, once the Zimmermans enrolled in the Debt Plan and paid the $798.00 Design Fee, their account was transferred from Cambridge to BC Mass, a for-profit company. BC Mass mailed the Zimmermans a welcome packet and proceeded to administer their account by negotiating a reduction in the interest rate on some of their debts, eliminating some of their late charges and fees, and decreasing the minimum payments on some of their accounts. The Zimmermans were never told that their account would be handled by a for-profit back office company, or that this company would be contacting their creditors and would have access

---

[7] Under the Good Payer Program, Cambridge solicited payments from its clients' creditors in exchange for Cambridge's services. For every six month period during which a client made all payments "on time and in the required amount," Cambridge would pay them a "bonus" of fifty percent of any contributions obtained from the client's creditors. The record does not disclose any further details about this program.

to personal information about them. To the contrary, the contract the Zimmermans signed with Cambridge explicitly identified the company as a "not-for-profit organization."

Approximately nine months after signing their contract with Cambridge, the Zimmermans terminated the relationship in September 2002. They filed for bankruptcy in late 2003.

## II.

This class action law suit originated in 2003, when the Zimmermans filed a complaint against John and Richard Puccio (the defendants), Cambridge Credit Counseling Corp., Cambridge/Brighton Budget Planning Corp., Brighton Credit Management Corp., Cambridge Credit Corp., Brighton Credit Corp., Brighton Debt Management Services, Ltd., Brighton Credit Corp. of Massachusetts, and several additional corporate defendants (the corporate defendants).[8] The Zimmermans' amended complaint charged the defendants with violations of CROA, 15 U.S.C. §§ 1679-1679j, and with unfair or deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.

The district court initially granted the defendants' motion to dismiss the Zimmermans' federal claims, finding that, as a non-profit entity, Cambridge was exempt from CROA. On appeal of that judgment, we vacated the district court's dismissal of the

---

[8] The additional defendants were Debt Relief Clearinghouse, Ltd., Cypress Advertising and Promotions, Southfork Asset Management Corp., and First Consumers Credit Management Corp.

-16-

plaintiffs' federal claims. <u>Zimmerman</u> v. <u>Cambridge Credit Counseling Corp.</u>, 409 F.3d 473, 479 (1st Cir. 2005). We concluded that the statutory exception to CROA liability for "any nonprofit organization which is exempt from taxation under section 501(c)(3)" of the Internal Revenue Code, 15 U.S.C. § 1679(a)(3)(B)(i), did not apply to the defendants simply because they had registered as section 501(c)(3) entities. <u>Zimmerman</u>, 409 F.3d at 475-77. Instead, we held that in order to qualify for the statutory exemption, an entity "must actually operate as a nonprofit organization <u>and</u> be exempt from taxation under section 501(c)(3)." <u>Id.</u> at 478 (emphasis in original).

In 2007, following our remand, the district court certified a class consisting of consumers whose Debt Plans were serviced by BC Mass,[9] and a subclass consisting of "all individuals who entered into a contract for a Debt Management Plan with Cambridge . . . from November 3, 1998 through September 18, 2006." After almost two years of discovery, the parties filed cross motions for summary judgment.[10] In January 2008, the district court

---

[9] The district court's December 6, 2007 class certification order defined the class as "[a]ll individuals who at any time after November 3, 1998 through to the present paid, directly or indirectly, any money or other valuable consideration to Brighton Credit Corp. of Massachusetts, Brighton Debt Management Services, Ltd., or First Consumers Credit Management Corp. for any service related to the individual's Debt Management Plan."

[10] During the intervening time, defendant Cambridge settled the action against it and was voluntarily dismissed. That settlement did not release the Puccios or any remaining defendants.

-17-

granted summary judgment for the plaintiffs. The court found that Cambridge, BCMC, CBBPC and BC Mass operated as Credit Repair Organizations within the meaning of CROA because they "crossed the boundary from credit counseling into credit repair with their continued and insistent representations to consumers that their services could only help improve clients' credit." Zimmerman, 529 F. Supp. 2d at 275. The court held that Cambridge was not exempt under CROA's provision for nonprofit organizations because it did not "in fact and as a matter of law, operate as a nonprofit." Id. at 277.

As credit repair organizations, Cambridge, BCMC, CBBPC and BC Mass were obligated to comply with the specific statutory requirements of CROA. The district court found that they had not complied with any of CROA's requirements. Id. at 278. Specifically, they did not provide consumers with a required disclosure statement, did not include certain required items in their service agreements, and did not give consumers a mandatory separate cancellation form along with the service agreement. Id. at 278-79. Additionally, they violated CROA by charging up-front fees to consumers before they had fully performed the promised services. Id. at 279.

Turning to the provisions of CROA directed not just at credit repair organizations, but at "any person," the court found

that the Puccios and the corporate defendants were liable for "mak[ing] or us[ing] . . . misleading representation[s] of the services of [a] credit repair organization" under 15 U.S.C. § 1679b(a)(3) and for "engag[ing] . . . [in a] course of business that constitutes or results in . . . an attempt to commit [] a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization" under 15 U.S.C. § 1679b(a)(4). Id. at 279-80. Specifically, the court found that the Puccio corporations misleadingly represented to clients that they would be retaining the services of a not-for-profit when, in fact, their accounts were immediately transferred to a for-profit corporation, id. at 279, and that such a misrepresentation also qualified as "a fraud or deception," id. at 280. The court found that all of the corporate defendants and the Puccios were liable for the activity of Cambridge, BCMC, CBBPC and BC Mass under either of two theories: (a) because they engaged in a deceptive "course of business" as prohibited under 15 U.S.C. § 1679b(a)(4); or (b) because the corporations served as the alter egos of the Puccios such that they and the Puccios could be held directly liable for Cambridge's actions by piercing the corporate veil. Id. at 271-72.

In March 2009, the district court entered its final judgment against the Puccios, awarding damages to the plaintiffs,

on behalf of the certified class, in the amount of $256,527,000.[11] The court made its award under CROA's compensatory damages provision which provides that "[a]ny person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such other person in an amount equal to the sum of . . . [t]he greater of . . . (A) the amount of any actual damage . . . or (B) any amount paid by the person to the credit repair organization."  15 U.S.C. § 1679g(a).  The court's $256.5 million award represented the amount paid by the class plaintiffs to the defendants through December 31, 2004.[12]

John and Richard Puccio now appeal from the district court's grant of summary judgment.  They contend, as a threshold matter, that the district court erred in granting summary judgment because Cambridge is not a credit repair organization within the meaning of CROA.  The Puccios further argue that even if Cambridge is a credit repair organization under CROA, there were disputed issues of fact that should have precluded the award of summary

---

[11] The district court also entered judgment against the corporate defendants.  They have not appealed that judgment.

[12] Although the certified class covered all individuals who paid money to Puccio corporations "through to the present," the plaintiffs agreed to limit the amount of damages to money paid through December 31, 2004, an amount that was specifically admitted by the defendants in their response to the plaintiffs' statement of uncontested facts.  The plaintiffs stipulated that all class members, including those who paid money after December 31, 2004, would be included in the distribution of funds to the class, but that "it is clear that the amount of the overall judgment will be so high already that not all of it will be collectable."

judgment on the fraud claim under Section 1679b(a)(4) of CROA. Their challenge to liability under Section 1679b(a)(3) is less straightforward. Primarily, the Puccios insist that the district court made no findings of liability under (a)(3). Secondarily, they argue that even if the district court did find them liable under (a)(3), the finding rests on the same flawed veil-piercing analysis that the district court used in finding them personally liable under (a)(4).[13]

### III.

The plaintiffs' claims under CROA present several pure questions of law, including issues of statutory interpretation. Our review of the district court's conclusions on those issues is de novo. Chiang v. Verizon New England, Inc., 595 F.3d 26, 34 (1st Cir. 2010).

We also review de novo the district court's entry of summary judgment. Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010). Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009). A material fact is one that would affect the outcome of the suit, while a genuine issue is one for

---

[13] The Puccios do not specifically contest the damages award.

-21-

which the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  Cianbro, 596 F.3d at 14.

Unlike a typical case in which a defendant moves for summary judgment, in this case the plaintiffs prevailed at summary judgment on claims for which they, as plaintiffs, would bear the burden of proof at trial.  The plaintiffs "cannot attain summary judgment unless the evidence that [they] provide[] . . . is conclusive."  Torres Vargas, 149 F.3d at 35.

**IV.**

CROA was enacted in 1996 for two express purposes: first, to "protect the public from unfair or deceptive advertising and business practices by credit repair organizations," and second, to "ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services."  15 U.S.C. § 1679(b).  Congress passed CROA, which became effective on April 1, 1997, in response to mounting evidence that unscrupulous individuals were making their fortunes by leading consumers to believe that they could repair a consumer's bad credit history.  See S. Rep. No. 103-209, at 7 (1993) ("Fraudulent companies that lead consumers to believe that the companies can 'repair' bad credit histories have bilked consumers of millions of dollars . . . ."); H.R. Rep. No. 103-486, at 63 (1994) (Credit repair "businesses, through advertisements and oral representations, lead

-22-

consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy."). In an attempt to combat such practices, CROA requires organizations that fall within its ambit to make certain disclosures prior to doing business with members of the public and prohibits them and persons connected with them from engaging in deceptive practices injurious to the public. See 15 U.S.C. §§ 1679b-1679e.

This appeal concerns two CROA provisions that explicitly apply to persons acting in connection with credit repair organizations. Those provisions state:

> No person may --
>
> . . .
>
> (3) make or use any untrue or misleading representation of the services of the credit repair organization; or
>
> (4) engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

Id. As this text makes clear, in order to find liability under either provision, a court must find that the services at issue are those of a credit repair organization, as defined by CROA. Accordingly, we turn first to this threshold definitional question.

## A. Application of CROA to Cambridge

### 1. Language of the Act

CROA applies to a category of businesses termed "credit repair organizations." A "credit repair organization" is defined by the act as:

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--
>
> (i) improving any consumer's credit record, credit history, or credit rating; or
>
> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . .

15 U.S.C. § 1679a(3)(A). In interpreting CROA, as with any act of Congress, "'our analysis begins with the language of the statute.'" Zimmerman, 409 F.3d at 475 (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)). The words Congress used to define a credit repair organization must always be taken "in their context and with a view to their place in the overall statutory scheme." David v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989). That overall scheme is a sweeping consumer protection act explicitly intended to "protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b). Such consumer protection statutes are construed "liberally in favor of consumers." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 171 (1st Cir. 2004).

By its plain language, CROA applies to "credit repair organizations." 15 U.S.C. § 1679a(3)(A). By focusing on the word "repair" in the defined term, the defendants seek to draw a distinction between purporting to repair or retroactively fix past credit problems and purporting to improve credit in the future. They argue that Congress intended CROA to apply to entities performing the function of retroactive credit repair but not those companies offering services aimed at improving clients' credit in the future. In support of their theory, the defendants cite <u>Hillis</u> v. <u>Equifax Consumer Servs., Inc.</u>, 237 F.R.D. 491 (N.D. Ga. 2006), in which the district court attempted to articulate such a distinction:

> the definition of a credit repair organization is narrower than a cursory reading of the statute would indicate. Specifically, when the statute refers to services whose purpose is to improve a consumer's 'credit record, credit history, or credit rating,' these terms [] refer to a consumer's historical credit record. Congress did not intend for the definition of a credit repair organization to sweep in services that offer only prospective credit advice to consumers or provide information to consumers so that <u>they</u> can take steps to improve their credit in the future.

<u>Id.</u> at 514.

The distinction drawn by the <u>Hillis</u> court, and embraced by the defendants, is unsupportable.[14] By its plain terms, CROA

---

[14] The theory put forward by the district court in <u>Hillis</u> appears to be an outlier. <u>Cf.</u> <u>Helms</u> v. <u>Consumerinfo.com, Inc.</u>, 436 F. Supp. 2d 1220 (N.D. Ala. 2005); <u>Polacsek</u> v. <u>Dedicated Consumer</u>

applies to organizations that provide, in exchange for consideration, "any service" for the "express or implied purpose" of improving a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3)(A). The language of the Act does not bind the concept of an improved credit record, credit history, or credit rating to the literal alteration ("repair") of an historical record, history, or rating. As the district court explained, "[t]he ostensibly forward-looking orientation" of representations about improving clients' credit "does not mitigate the obvious message to debtors that [those] services might modify the effect of their past credit history on their credit score." Zimmerman, 529 F. Supp. 2d at 275. Credit records are constantly changing based on the ongoing performance of the consumer. By improving credit behavior prospectively, a consumer aims to improve a pre-existing credit record, credit history, and/or credit rating with a more favorable record, history, or rating in the future. Thus, credit counseling aimed at improving future creditworthy behavior is the quintessential credit repair service.

2. The Facts of this Case

As detailed earlier in this opinion, the undisputed facts are that in advertisements, informational materials, and employee scripts, Cambridge repeatedly represented to consumers that its debt management services would "restore your credit rating" and

Counseling, 413 F. Supp. 2d 539, 546 (D. Md. 2005).

-26-

"improve your credit." Puccio company employees were trained to tell customers that a Debt Plan "can only help your credit." At a certain point, the employee scripts instructed that clients be told, "Our program is designed to help you get out of debt and improve your credit rating." Even more explicitly, the script stated, "Over the course of the program, your credit rating will improve." Cambridge's promotional materials made promises such as "[w]hen you join our debt management program, we'll be able to help you reestablish your credit." The Cambridge website contained a feature which answered questions such as, "How Can I Rebuild My Credit?" Their quarterly newsletter dispensed advice on the same subject. The welcome package mailed to customers listed "an improved credit profile" as among the "life benefits you receive by using our program." BC Mass employees contacted clients' creditors to try to negotiate "re-aging" of accounts, a process designed to improve credit scores by relabeling delinquent accounts as current.

The Puccios cite the disclaimer in Cambridge's contract stating that "[t]he CLIENT'S credit rating is outside of the scope of this Agreement" as evidence that the company did not represent that it would improve a client's credit rating. Apparently, the Puccios believe that a company could represent repeatedly in advertisements, on its website, and in its employee scripts, that it would help improve clients' credit ratings, but escape liability under CROA by inserting a disclaimer in its contract about the

relevance of its services to the credit rating of its clients. That is an implausible position which captures the duplicity of the Puccios' enterprises. Cambridge repeatedly held itself out as a company that would provide "advice and assistance" in order to "improv[e] any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679a(3)(A)(i)-(ii). Those services are squarely covered by CROA.

## B. Application of CROA to the Puccios

The district court found the Puccios liable for violating both Section 1679b(a)(3), which prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization," and Section 1679b(a)(4), which prohibits, either through an act or a course of business, the commission or attempted commission of "a fraud or deception" in connection with the offer or sale of the services of a credit repair organization. 15 U.S.C. § 1679b(a)(4). Because we affirm the finding of liability under Section 1679b(a)(3), which suffices to support the judgment, we do not reach the question of the Puccios' liability under Section 1679b(a)(4).

1. The District Court's Finding of Liability Under Section 1679b(a)(3)

In their opening brief on appeal, the Puccios offer no challenge to their liability under Section 1679b(a)(3). In their reply brief, they explain that curious omission, contending that the district court did not actually find them liable under Section

-28-

1679b(a)(3). That position is untenable. The district court unambiguously held in section III.C.3.a of its opinion, entitled "CRO Violations," that the "[d]efendants betrayed [p]laintiffs' trust when, as was its policy for all [Cambridge] clients, it transferred Plaintiffs' account to BC Mass, straightforwardly violating § 1679b(a)(3)" by misleading consumers into thinking they were doing business with a non-profit corporation, when, in fact, their accounts were being wholly serviced by a for-profit. Zimmerman, 529 F. Supp. 2d at 279. The court then made explicit in section III.C.3.b, entitled "Non-CRO Violations," that "[t]hose Defendants that are not themselves CROs within the meaning of CROA - namely, John and Richard Puccio, . . . are still liable for the above violations." Id. at 280. That statement is an unmistakable finding that all of the defendants, both the credit repair organizations themselves, and John and Richard Puccio, violated Section 1679b(a)(3).[15]

2. The District Court's Decision to Pierce the Corporate Veil to Support Section 1679b(a)(3) Liability

The Puccios argue in the alternative that, if the district court did find them personally liable under Section 1679b(a)(3), the district court's veil piercing analysis does not

---

[15] The court made one exception for an enterprise called Southfork. Zimmerman, 529 F. Supp. 2d at 280 n.27. The court dismissed Southfork from the case after noting that the plaintiffs had not presented any evidence suggesting that the company was significantly involved in the Puccios' credit repair business. Id.

support that determination.  Again, that barely developed argument appears for the first time as a footnote in their reply brief.  Ordinarily, such an undeveloped argument, raised for the first time in a footnote to the defendants' reply brief, would not suffice to raise an argument, see Waste Mgmt. Holdings, Inc., v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000).  Here, however, we see no meaningful difference between the Puccios' fully developed challenge to the veil piercing analysis of the district court under Section 1679b(a)(4) and the challenge to that analysis under Section 1679b(a)(3).  We therefore choose to address the Section 1679b(a)(3) veil piercing argument of the Puccios on the merits.

To be sure, we tread carefully when determining whether it is appropriate to put aside the basic tenet of corporate law that "corporations - notwithstanding relationships between or among them - ordinarily are regarded as separate and distinct entities," Scott v. NG U.S. 1, Inc., 881 N.E.2d 1125, 1131 (Mass. 2008), and thereby to "allow a plaintiff to pierce the corporate veil of limited liability." In re Ontos, Inc., 478 F.3d 427, 432 (1st Cir. 2007).  In Massachusetts, "the corporate veil will only be pierced in rare situations." Birbara v. Locke, 99 F.3d 1233, 1239 (1st Cir. 1996).[16]  Such situations do occur, however, and Massachusetts

---

[16] We acknowledge the Puccios' suggestion that the veil-piercing question, given its relevance to the federal cause of action in this case under CROA, may be viewed as one of federal common law.  While "we arguably have discretion to use federal law," Nisselson v. Lernout, 469 F.3d 143, 154 n.3 (1st Cir. 2006),

has recognized that it is the "right and the duty of courts to look beyond the corporate forms" when necessary "for the defeat of fraud or wrong, or the remedying of injustice."  Hanson v. Bradley, 10 N.E.2d 259, 264 (Mass. 1937) (quoted in Scott, 881 N.E.2d at 1132).

Massachusetts has identified as relevant to the veil-piercing analysis a set of twelve factors.  They are: "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."[17] Att'y Gen. v. M.C.K., Inc., 736 N.E.2d 373, 381 n.19 (Mass. 2000). Looking to some of these factors, and to the guidance provided in the seminal Massachusetts case, My Bread Baking Co. v. Cumberland

we choose to apply Massachusetts law.  Id. at 154 ("We look to state law to ascertain when wrongful conduct should be imputed to a corporation.").

[17] That list is not exhaustive, nor does every factor have to be present in every veil piercing case.  The list, rather, is an analytical tool used to "form an opinion whether the [corporation's] over-all structure and operation misleads." Evans v. Multicon Constr. Corp., 574 N.E.2d 395, 400 (Mass. App. Ct. 1991), review denied, 577 N.E.2d 309 (1991).

<u>Farms, Inc.</u>, 233 N.E.2d 748, 751-52 (Mass. 1968), we find ourselves confronted with a textbook case for lifting the corporate veil.

The undisputed evidence shows that the Puccios owned and had "pervasive control" over all of the entities involved in this litigation, including Cambridge. John Puccio set the terms of dealing among the Puccio companies, which functioned without clear boundaries or separate corporate structures. Those dealings were conducted without independent representatives to protect the interests of the individual corporations.

Further, there was a total failure to "make clear which corporation [was] taking action" or "to observe with care" the corporate form. <u>My Bread</u>, 233 N.E.2d at 752. The Puccios did not delineate between their businesses,[18] channeling funds between them, using employees interchangeably and applying funds from one entity to pay the bills for another.[19] Corporate formalities of even the most basic nature were largely nonexistent, as when Cambridge purchased BCC and CCC's nonexistent "intangible assets" for over $14 million.

---

[18] For example, as we outlined earlier, while John Puccio was running Cambridge, that company paid $150,000 to another Puccio enterprise, JRJ Associates, Inc., without receiving any consideration for the payment.

[19] As described above, at least one person who worked at various times for Cambridge, CCC, and BC Mass, received the bank statements and paid the bills of one of those companies while he was not an employee of that company, but was instead on the payroll of a different Puccio entity.

The facts also show an obvious "element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties [could not] be quite certain with what they [were] dealing." Evans v. Multicon Constr. Corp., 574 N.E.2d 395, 400 (Mass. App. Ct. 1991), review denied, 577 N.E.2d 309 (1991). When customers contracted with Cambridge, their accounts became wholly serviced by BC Mass. The plaintiffs were utterly "misled about which corporate entity - [Cambridge or BC Mass] - was obligated to them or was dealing with them." Birbara, 99 F.3d at 1239 (refusing to pierce the corporate veil in the absence of any confusion about which corporate entity was in dealings with the plaintiffs). The Puccios also siphoned money from corporate accounts to pay for personal expenses such as adult entertainment and costs associated with a yacht.

As the district court rightly emphasized, the money that was funneled from Cambridge into other Puccio entities and ultimately to the Puccios themselves cannot be reached by the settlement with Cambridge or the judgment against the other corporations. In order to obtain full relief, the plaintiffs must be able to reach the Puccios, who were the lead players in the scheme being carried out by their network of corporations.

That logic is at the very heart of the alter ego doctrine. See 1 W.M. Fletcher, Cyclopedia of the Law of Corporations § 41.10 (2010) ("One rationale behind the theory [of

-33-

alter ego liability] is that if the shareholders or the corporations themselves disregard the proper formalities of a corporation, then the law will do likewise as necessary to protect individual and corporate creditors."). The corporate form should not bar the plaintiffs from seeking the full relief to which they are entitled when the defendants themselves treated Cambridge and their other companies as mere shells, ignoring financial, legal and practical formalities in furtherance of their own money-making enterprise. In short, we agree with the trenchant assessment of the district court:

> Defendants served as alter egos of the Puccios and thus may be held directly liable for [Cambridge's] actions by piercing [Cambridge's] corporate veil. Since funds were funneled out of [Cambridge] to other entities in the Puccios' network and ultimately to the Puccios themselves, the settlement with [Cambridge] could not provide the Zimmermans with full relief and they must now seek their remedy from these other defendants. The corporate form should not serve as an obstacle to that relief where, as here, it was a mere shell, ignored by the Puccios in their everyday business dealings.

Zimmerman, 529 F.Supp.2d at 271-72.[20]

## V.

When Cambridge held itself out as an organization that could help consumers "rebuild," "reestablish" and "restore" their credit, it operated as a "credit repair organization" within the

---

[20] The Puccios' only "merits" challenge to their liability under Section 1679b(a)(3) was their veil piercing challenge.

-34-

meaning of CROA.  Having made that threshold determination correctly, the district court pierced the corporate veil to find that the Puccios were personally liable under Section 1679b(a)(3) of CROA for a misrepresentation by Cambridge that it offered credit repair services as a non-profit entity.  That determination was also correct.  We therefore affirm the district court's grant of summary judgment to the plaintiffs based on the liability of the Puccios for violations of 15 U.S.C. § 1679b(a)(3).

So ordered.

| Acronym | Name | Function | Location | Status |
|---------|------|----------|----------|--------|
| BCC | Brighton Credit Corporation | Credit Counseling | New York | For-profit |
| BC Mass* | Brighton Credit Corp. of Massachusetts Brighton Debt Management Services, Inc. First Consumers | Back Office | Mass | For-Profit |
| BCMC | Brighton Credit Management Corporation | Credit Counseling | Florida | For-profit |
| Cambridge ** | Cambridge Credit Counseling Corporation | Credit Counseling | Mass | Non-Profit |
| CBBPC | Cambridge/Brighton Budget Planning Corporation | Credit Counseling | New York | For-profit |
| CCC | Cambridge Credit Corporation | Credit Counseling | New York | For-profit |
|  | Debt Relief Clearinghouse Ltd. | Marketing |  |  |
|  | Cypress Advertising and Promotions, Inc. | Advertising |  |  |

* For-profit company providing the services offered by Cambridge.
** Company responsible for misleading representations that its clients were contracting for the services of a not-for-profit.